No. 26-2653

# In The United States Court of Appeals For the Seventh Circuit

JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY,

Plaintiffs-Appellants,

v.

HEIDI E. MUELLER, in her official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois,

Defendants-Appellees.

Appeal from a Judgment of the United States District Court
for the Central District of Illinois
The Hon. Sue E. Myerscough, District Judge
Case No. 3:18-CV-3085

## APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547/630.596.4445 Fax
dsigale@sigalelaw.com

Exhibit A

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2653

Short Caption: Jennifer J. Miller, et al v. Heidi Mueller, in her official capacity, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Jennifer J. Miller, Darin E. Miller, Second Amendment Foundation, Inc., Illinois State Rifle Association, Illinois Carry

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Law Firm of David G. Sigale, P.C.

Cooper & Kirk, PLLC

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Second Amendment Foundation (None); Illinois State Rifle Association (None); Illinois Carry (None)

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

Second Amendment Foundation (None); Illinois State Rifle Association (None); Illinois Carry (None)

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: /s/ David G. Sigale Date: August 17, 2026

Attorney's Printed Name: David G. Sigale

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 55 West 22nd Street, Suite 230, Lombard, IL 60148

Phone Number: 630.452.4547 Fax Number: 630.596.4445

E-Mail Address: dsigale@sigalelaw.com

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on August 17, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ David G. Sigale

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on ____________________, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

| counsel / party: | address: |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

s/____________________________________

TABLE OF CONTENTS

Table of Contents .......... i

Table of Authorities .......... iii

Jurisdictional Statement .......... 2

Statement of Issues .......... 3

Statement of the Case .......... 3

The Challenged Regulations .......... 4

The Effect on Plaintiffs .......... 7

Procedural History .......... 8

The District Court's Decision .......... 9

Summary of Argument .......... 13

Argument .......... 20

I. Summary Judgment Standard .......... 20

II. *Bruen* makes clear that the Second Amendment requires a categorical approach based on text and history. .......... 22

III. The Foster Home Ban and Day Care Home Ban are inconsistent with the Second Amendment's text and history .......... 26

A. The proper historical analysis focuses on Founding-Era restrictions, and late-nineteenth-century laws cannot be used to contradict the Second Amendment's plain meaning .......... 27

B. Modern firearm restrictions must be closely analogous to historical restrictions, and the inquiry into historical analogues does not give the State a regulatory blank check. ........................ 33

C. The challenged bans are not justified by any historical tradition of firearm regulation. ................................................................... 37

D. Neither foster homes nor home day cares qualify as "sensitive places." ........................................................................................ 40

IV. The forced abandonment of Second Amendment rights by foster parents and home day care operators is an unconstitutional condition of obtaining such a license ..................................... 57

CONCLUSION ............................................................................. 73

## TABLE OF AUTHORITIES

**Cases**

*Burgess v. Lowery*,
201 F.3d 942 (7th Cir. 2000) .......................................................... 65, 68

*Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*,
24 F.4th 640 (7th Cir. 2022) .................................................................. 69

*Coyne-Delany Co., Inc. v. Capital Dev. Bd.*,
616 F.2d 341 (7th Cir. 1980)................................................................. 63

*Crawford v. Washington*,
541 U.S. 36 (2004) ................................................................................ 29

*Daunt v. Benson*,
956 F.3d 396 (6th Cir. 2020) ................................................................ 70

*District of Columbia v. Heller*,
54 U.S. 570 (2008) ........................................................ 1, 4, 8, 13, 14,
17, 22, 23, 26, 32, 41, 52, 59, 66, 72

*Drummond v. Robinson*,
9 F.4th 217 (3d Cir. 2021) .........................................................43

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................................ 33

*Fitzsimmons v. Best*,
528 F.2d 692 (7th Cir. 1976) ...........................................................20

*Frost v. Railroad Comm'n of Cal.*,
271 U.S. 583 (1926) ............................................................ 18, 59, 60, 67

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) .................................................................. 58, 67

*Gaddis v. DeMattei*,
30 F.4th 625 (7th Cir. 2022) ................................................................. 21

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ..................................................................... 61, 63, 71

*Johnson v. Lyon*,
406 F. Supp. 3d 651 (W.D. Mich. 2018) ............................................ 56

*Khan v. State Oil Co.*,
93 F.3d 1358 (7th Cir. 1996) ................................................................. 31

*King v. Preferred Technical Group*,
166 F.3d 887 (7th Cir. 1999) ................................................................. 21

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ......................................................................... 18, 64

*Lafferty v. Pertl*,
2026 Wisc. App. LEXIS 885 (2nd Dist.) ................ 38, 40, 41, 56, 57, 73

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ............................................................................. 29

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................ 13, 14, 22, 25, 28

*Malloy v. Hogan*,
378 U.S. 1 (1964) ................................................................................ 28

*Minnesota v. Carter*,
525 U.S. 83 (1998) ............................................................................... 56

*Mintz v. Mathers Fund, Inc.*,
463 F.2d 495 (7th Cir. 1972) .......................................................... 21

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ............................................................ 33

*Myers v. United States*,
272 U.S. 52 (1926) ......................................................................... 29

*NASA v. Nelson*,
562 U.S. 134 (2011) ....................................................................... 63

*Nevada Comm'n on Gaming Ethics v. Carrigan*,
564 U.S. 117 (2011) ........................................................................ 29

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) .......................... 8, 15, 23, 24, 25, 26, 30, 32, 33, 34, 38,
41, 47, 50, 51, 52, 53, 54, 56, 63, 69, 71, 72

*Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't Health*, 699 F.3d 962 (7th Cir. 2012) ..........................19, 60, 65, 71

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992) ....................................................................... 57

*Poller v. Columbia Broadcasting System*,
368 U.S. 464 (1962) ....................................................................... 20

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006) ............................................................... 63, 64

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025) ............................... 35, 42, 43, 45, 51, 52,
53, 54, 55, 56

*Semayne's Case*,
5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1604) ................................ 56

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) ................................................................. 31

*United States v. Hemani*,
146 S. Ct. 1677 (2026) ................................................ 15, 34 ,40

*United States v. Rahimi*,
602 U.S. 680 (2024) ............................................... 15, 24, 34, 43

*Van Dyke v. Fultz*,
2018 WL 1535141 (N.D. Ill. Mar. 29, 2018) .............................. 10, 62, 71

*Virginia v. Moore*,
553 U.S. 164 (2008) ................................................................. 29

*Winter v. Minn. Mut. Life Ins. Co.*,
199 F.3d 399 (7th Cir. 1999) ................................................ 21

*Wolford v. Lopez*,
146 S. Ct. 2032 (2026) ................................................... 15, 35

<u>**Constitutions and Statutes**</u>

U.S. CONST. Amend. II ............................................................ 22

Fed. R. Civ. P. 56(c) .............................................................. 20

225 ILCS 10/7 ................................................................... 9, 10

89 Ill. Adm. Code 402.8 ..................................................... 4, 10

89 Ill. Adm. Code 406.8 ..................................................... 6, 12

D.C. CODE §§

7-2501.01(12) ........................................................................13

7-2502.01(a) .......................................................................... 13

7-2502.02(a)(4) .....................................................................13

<u>**Other Authorities**</u>

Mark W. Smith, "*Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022) *available at* https://bit.ly/3CMSKjw ........................................................ 27

U.S. DHS, NATIONAL MODEL FOSTER FAMILY HOME LICENSING STANDARDS,
https://bit.ly/3cA1Jvq ......................................................................... 72

## APPELLANTS' BRIEF

## INTRODUCTION

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," and it struck down two D.C. rules as categorically inconsistent with that right: a flat ban on "handgun possession in the home" and a requirement that any other "firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628. Defendants in this case impose *precisely* the same regime on homeowners who serve as licensed foster caregivers, or licensed providers of day care in their home. Under the laws and regulations challenged here, law-abiding citizens are completely prohibited from having a handgun in the home if they operate a day care there; and both home day care providers and foster caregivers must keep any other firearms kept in their home unloaded and locked away separately from any ammunition—an onerous requirement that amounts to a "prohibition against rendering any lawful firearm in the home operable

for the purpose of immediate self-defense." *Id.* at 635. The district court has now twice upheld these bans, but it was wrong both times to do so. Just like the same rules struck down in *Heller*, the limits here make it practically impossible for "responsible citizens to use arms in defense of hearth and home," *id.*, and they must meet the same fate.

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants ("Plaintiffs") seek reversal of the District Court's grant of an F.R. Civ. P. 56(a) Motion for Summary Judgment in favor of the Defendants-Appellees (collectively, "Defendants"), and the denial of Plaintiffs' F.R. Civ. P. 56 cross-Motion for Summary Judgment. They seek—under the Second and Fourteenth Amendments to the United States Constitution - declaratory judgment and a permanent injunction barring enforcement of the Illinois statutory and regulatory provisions at issue. The District Court had jurisdiction under 28 U.S.C. § 1331, 1343, 2201 and 2202.

This Court has jurisdiction under 28 U.S.C. § 1291 because the District Court rendered a final judgment granting the Defendants' F.R. Civ. P. 56(a) Motion for Summary Judgment.

i. The order sought to be reviewed was rendered August 3, 2026. *See* Short Appendix 1 ("SA"). The accompanying Opinion was also issued on August 3, 2026. SA2.

ii. There were no other orders tolling the time in which to appeal.

iii. The Notice of Appeal was filed August 11, 2026. SA118.

## STATEMENT OF ISSUES

1. Whether Defendants may ban law-abiding citizens licensed to serve as foster parents from possessing any firearm operable for the purpose of immediate self-defense in their home.

2. Whether Defendants may ban law-abiding citizens licensed to operate a day care in their home from possessing handguns, and from possessing any firearm operable for the purpose of immediate self-defense, in their home.

## STATEMENT OF THE CASE

The statutes and regulations at issue in this appeal severely restrict the fundamental right of homeowners who serve as foster parents or operate a daycare in their homes to keep "any lawful firearm

in the home operable for the purpose of immediate self-defense." *Heller*, 554 U.S. at 635.

## I. The Challenged Regulations

### A. The Foster Home Ban.

Defendant Department of Children and Family Services' ("DCFS") regulations flatly ban law-abiding citizens who serve as foster aregivers from having firearms immediately operable for self-defense in their own homes at any time. 89 Ill. Admin. Code § 402.8(o) provides:

> Any and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children. . . .
>
> Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

Apart from the carve-out for law-enforcement officers, there are no exceptions to this ban—not for licensed foster caregivers who do not currently have a foster child placed with them, not for homeowners who possess an Illinois Concealed Carry License, not for homeowners who employ storage mechanisms inaccessible to children (such as biometric

gun safes), and not even for loaded firearms kept in the homeowner's immediate possession.

**B. The Day Care Home Ban.**

The State imposes similar restrictions on citizens who provide day care services from their home. The statute governing the state licensing of home day cares requires DCFS to promulgate numerous, overlapping restrictions on the possession of firearms in home day cares:

- "Provisions prohibiting firearms on day care center premises except in the possession of peace officers;"

- "Provisions prohibiting handguns on day care home premises except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside on the premises of a day care home;"

- "Provisions requiring that any firearm permitted on day care home premises, except handguns in the possession of peace officers, shall be kept in a disassembled state, without ammunition, in locked storage, inaccessible to children and that ammunition permitted on day care home premises shall be kept in locked storage separate from that of disassembled firearms, inaccessible to children;" and

- "Provisions requiring notification of parents or guardians enrolling children at a day care home of the presence in the day care home of any firearms and ammunition and of the arrangements for the separate, locked storage of such firearms and ammunition."

225 ILCS 10/7(a)(12)–(15).

Pursuant to this statutory command, Defendant DCFS has promulgated regulations (1) flatly banning the possession of handguns in any day care home (except for law-enforcement officers or others required to possess a handgun as a condition of employment), (2) requiring all other firearms (*i.e.*, long guns) to be "kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children" (except, again, in the case of law-enforcement officers); (3) requiring that all "[a]mmunition for such firearms shall be kept in locked storage separate from that of the disassembled firearms, inaccessible to children"; and (4) requiring the homeowner operating the day care to "post a 'no firearms' sign" and "notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises," "locked in storage inaccessible to children." 89 Ill. Admin. Code § 406.8(a)(17)–(18).

On their face, these restrictions admit of no exceptions. Defendants have asserted, and the district court held, that these restrictions on day care homes have effect only during business hours, when the day care is operating. SA 7, but no such limitation appears in the text of the statutory or regulatory provisions at issue, —and on their face, those provisions apply absolutely, at all times. Like the foster care ban, the day care home ban likewise includes no other exceptions, apart from the carve-out for law-enforcement officers—no matter how carefully the homeowners have been vetted or how securely they store their firearms.

**The effect on Plaintiffs.**

Plaintiffs Jennifer and Darin Miller are licensed foster parents who intend to foster in the future. Dkt. #93-2 at ¶ 2. Ms. Miller is also licensed to operate a day care in the Miller's home. *Id.* ¶ 4. Accordingly, they are subject to Illinois's restrictions on the possession of firearms in both day care and foster homes—restrictions that, as described above, bar them from possessing a handgun in their home and from possessing any sort of firearm "operable for the purpose of immediate self-defense,"

*Heller*, 554 U.S. at 635, at any time. Were it not for the challenged restrictions, Mr. Miller would exercise his Second Amendment right to possess a firearm for self-defense both inside and outside his home, and Ms. Miller would exercise her Second Amendment right to possess a firearm for self-defense inside their home. Dkt. #93-2 at ¶ 9[1]

**Procedural History.**

Plaintiffs brought suit challenging the day care home restrictions on April 16, 2018. In May 2019, they amended their complaint to also include a challenge to the foster care restrictions. Following discovery, Defendants moved for summary judgment, and the district court granted Defendants' F.R. Civ. P. 56(a) Motion for Summary Judgment on March 14, 2022. Plaintiffs timely appealed to this Court as Case No. 22-1482. On January 20, 2023, this Court vacated the district court's judgment and remanded with instructions in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1

[1] Plaintiffs Second Amendment Foundation, Illinois State Rifle Association, and Illinois Carry each have at least one member who is a licensed day care home operator and/or foster parent who would possess in the home a firearm operable for the purpose of immediate self defense were it not for the challenged restrictions. Dkt. #93-2 at ¶ 75.

(2022), which was issued during the briefing of the first appeal of this matter.

On remand, Plaintiffs filed a Second Amended Complaint on October 4, 2024. The Defendants again moved for summary judgment pursuant to F.R. Civ. P. 56(a) on September 5, 2025.

**The District Court's Decision**

On August 3, 2026, the district court issued an Order granting Defendants' F.R. Civ. P. 56(a) Motion for Summary Judgment and denying Plaintiffs' Motion for Summary Judgment (SA1). The district court issued an accompanying Opinion explaining its decision (SA2). The District Court entered judgment for the Defendants on August 3, 2026 (SA1).

**Text of Challenged Statute and Rules**

**<u>Foster Care</u>**

Section 10/7 of the Illinois Child Care Act of 1969 (225 ILCS 10/7) states in relevant part:

> (a) The Department must prescribe and publish minimum standards for licensing that apply to the various types of facilities for child care defined in this

> Act and that are equally applicable to like institutions under the control of the Department and to foster family homes used by and under the direct supervision of the Department.
>
> The Department shall seek the advice and assistance of persons representative of the various types of child care facilities in establishing such standards. The standards prescribed and published under this Act take effect as provided in the Illinois Administrative Procedure Act, and are restricted to regulations pertaining to the following matters and to any rules and regulations required or permitted by any other Section of this Act.

Section 402.8(o) of Title 89 of the Illinois Administrative Code ("General Requirements for the Foster Home"), restated as IDCFS Rule 402.8(o) (formerly 402.8(i) states in relevant part:

> Any and all firearms and ammunition shall be locked up at all times and kept in places inaccessible to children. No firearms possessed in violation of a State or Federal law or a local government ordinance shall be present in the home at any time. Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

<u>**Day Care:**</u>

Section 10/7 of the Illinois Child Care Act of 1969 (225 ILCS 10/7) states in relevant part:

(a) The Department must prescribe and publish minimum standards for licensing that apply to the various types of facilities for child care defined in this Act and that are equally applicable to like institutions under the control of the Department and to foster family homes used by and under the direct supervision of the Department.

The Department shall seek the advice and assistance of persons representative of the various types of child care facilities in establishing such standards. The standards prescribed and published under this Act take effect as provided in the Illinois Administrative Procedure Act, and are restricted to regulations pertaining to the following matters and to any rules and regulations required or permitted by any other Section of this Act:

. . .

(13) Provisions prohibiting handguns on day care home premises except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside on the premises of a day care home;

(14) Provisions requiring that any firearm permitted on day care home premises, except handguns in the possession of peace officers, shall be kept in a disassembled state, without ammunition, in locked storage, inaccessible to children and that ammunition permitted on day care home premises shall be kept in locked storage separate from that of disassembled firearms, inaccessible to children;

> (15) Provisions requiring notification of parents or guardians enrolling children at a day care home of the presence in the day care home of any firearms and ammunition and of the arrangements for the separate, locked storage of such firearms and ammunition;

Section 406.8(a) of Title 89 of the Illinois Administrative Code ("General Requirements for Day Care Homes") states in relevant part:

> 17) Handguns are prohibited on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home. The licensee shall post a "no firearms" sign, as described in Section 65(d) of the Firearm Concealed Carry Act [430 ILCS 66/65(d)], in a visible location where parents pick up children.
>
> 18) Any firearm, other than a handgun in the possession of a peace officer or other person as provided in subsection (a)(17), shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children.
>
> > A) Ammunition for such firearms shall be kept in locked storage separate from that of the disassembled firearms, inaccessible to children.

## SUMMARY OF ARGUMENT

The Foster Home and Day Care Home Rules at issue in this case — which ban law-abiding adults licensed to foster parent, or provide day care in their own homes, from keeping "any lawful firearm in the home operable for the purpose of immediate self-defense," violated the Second Amendment and *Heller*, 554 U.S. at 635. In *Heller*, the Supreme Court - among its other holdings - struck down District of Columbia's "safe storage" requirements, which in that case were "a requirement that all guns be kept "unloaded and either disassembled or secured by a trigger lock, gun safe, locked box, or other secure device" except when located in a place of business or being used for lawful recreational activities." *See* D.C. CODE §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4); *see also Heller*, 554 U.S. at 575. The stated reason was that "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 570 U.S. at 630.

The Supreme Court stated in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) that the Second Amendment "guarantee[s]

the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592; *see also McDonald*, 561 U.S. at 767. This comports with *Heller*'s holding that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home." *Heller*, 554 U.S. at 635 (emphasis added).

In *McDonald*, the Supreme Court reminded the lower courts that the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." 561 U.S. at 780.

The District argued in *Heller* that the Court should read into the storage restrictions an exception for self-defense, but the Court rejected that reading, holding it "is precluded by the unequivocal text, and by the presence of certain other enumerated exceptions" of which self-defense is not included. *See Heller*, 570 U.S. at 630. This rejection was also noted in Justice Breyer's dissent. *Id.* at 692 (2008) (Breyer, J., dissenting). That same lack of ability for self-defense is present in this case, and while the penalties for non-compliance differ, the threat of

fostering and daycare license revocation is just as - if not more – severe than whatever criminal penalty the District was threatening to impose.

Since this case began, and as this Court noted when it issued its Order of remand, the Supreme Court issued its opinion in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which significantly—and decisively—changed the Second Amendment analysis by abrogating the "two-step" framework previously applied in Second Amendment cases. Under the historical analysis required by *Bruen*, Defendants have no support for the prohibitions and restrictions challenged in this suit. *Bruen* is fatal to them.

When *Bruen*'s careful instructions for applying its text and history test are followed, it becomes inescapably clear that the challenged rules find no justification in "this Nation's historical tradition of firearm regulation." *Id.* at 2135. When later cases such as *United States v. Hemani*, 146 S. Ct. 1677 (2026), *Wolford v. Lopez*, 146 S. Ct. 2032 (2026), and *United States v. Rahimi*, 602 U.S. 680 (2024) are factored into the equation, this conclusion of unconstitutionality is only made stronger.

However, the lower court committed reversible error when it wrongly held that (1.) foster homes and daycare homes are "sensitive places;" (2.) the Defendant's restrictions and prohibitions have a historical basis and are constitutional under *Bruen*, and (3.) the Defendants' prohibitions and restrictions are not unconstitutional conditions of obtaining a foster and/or home daycare license.

Because the bans challenged here have precisely the same effect as the ones struck down in *Heller*, the lower court's ruling can only be defended if Defendants can distinguish that case based on the two features that define the class of people burdened by their restrictions: (1) that they have opened their homes as "designated spaces for the care of young children," and (2) that their decision to obtain a license for that purpose was a voluntary one, such that they "can preserve their Second Amendment rights by ceasing to operate" as day or foster care providers. The district court found both of these features significant enough to yield a different result than in *Heller* and *Bruen*. That was error.

As to the first distinction, while *Heller*—and the Founding-Era history it is based upon—support the proposition that *actual schools* can be "sensitive places" where the government may bar students from carrying firearms, 554 U.S. at 626, that exception to the Second Amendment's scope does not justify the restrictions at issue here for at least two reasons. First, there is absolutely *no* historical support for extending the "sensitive places" exception off of school grounds and into *any* space "designated . . . for the care of young children," SA 28—including *private homes*, "where the need for defense of self, family, and property is most acute," *Heller*, 554 U.S. at 628. And second, while historical limits on firearms in actual schools may support *disarming students*, there is no support for *disarming the adults that work there*. Accordingly, the fact that home day cares are "designated spaces for the care of young children," SA 28, cannot suffice to distinguish *Heller*. After all, *Heller*'s square holding is that firearms may not be banned in the home, and the home is *the paradigmatic* space designated for the care of young children.

Nor is the element of voluntariness involved in applying for a foster care or day care license sufficient to justify the challenged regime. SA 85. It has long been settled that "constitutional guaranties, so carefully safeguarded against direct assault" cannot be "open to destruction by the indirect, but no less effective, process of requiring a surrender, which, though in form voluntary, in fact lacks none of the elements of compulsion." *Frost v. Railroad Comm'n of Cal.*, 271 U.S. 583, 593 (1926). The many cases rejecting government attempts to extract a "voluntary" surrender of rights "reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Under that doctrine, the fact that the Plaintiffs voluntarily chose to apply for government licensure to operate a day care or foster care—"a privilege which may be vital to [their] livelihood" and which only the State can grant, *Frost*, 271 U.S. at 593—cannot affect the constitutional analysis either. After all, "what a government cannot compel, it should not be

able to coerce." *Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012).

Accordingly, the bans at issue in this case are materially indistinguishable from the ones struck down in *Heller*. They are thus flatly contrary to "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. at 635.

They also have no historical basis in this country, and therefore fail the *Bruen* analysis as well, for the Defendants could not meet their burden of showing the challenged laws and rules are consistent with the Nation's historical tradition of firearm regulation. This is because Defendants could not (1) offer analogues from the appropriate *historical period*, and (2) could not offer "well-established and representative" historical restrictions that are closely analogous to the challenged bans.

Therefore, the challenged rules clearly fail to meet constitutional muster under *Bruen*. *All* other States that impose general firearm storage requirements include an allowance for carrying on the person, and Defendants' expert witness expressly testified that he has "no empirical data . . . and so no scientific opinion" regarding whether such

a regime would be less safe than the challenged one. Dep. of Dr. Matthew Miller at 200:20–21, Dkt. # 64-1. That critical concession is alone fatal to Defendants' restrictions on day care and foster care homes.

That the district court nonetheless found the *Bruen* standard met by labeling people's homes as "sensitive places," and finding the forced restrictions to not be unconstitutional conditions of licensing, was reversible error, and summary judgment for the Defendants must be reversed, while Plaintiffs' cross-Motion for Summary Judgment must be granted.

## ARGUMENT

### I. Summary Judgment Standard

". . . [S]ummary judgment is appropriate only if it appears that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir. 1976) (citing F.R. Civ. P. 56(c); quoting *Poller v. Columbia Broadcasting System*, 368 U.S. 464 (1962)).

"As a procedural matter, granting summary judgment, while a drastic remedy, is a wholesome one where applicable to the circumstances. It is never warranted except on a clear showing that no genuine issue as to any material fact remains for trial. If the pleadings and proof in the form of depositions, affidavits and admissions on file disclose that no real cause of action or defense exists, the court may determine there is no issue to be tried and may grant a summary judgment." *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972).

In evaluating a summary judgment motion, the court focuses on whether any material dispute of fact exists that would require a trial. *Winter v. Minn. Mut. Life Ins. Co.*, 199 F.3d 399, 408 (7th Cir. 1999). In making this determination, the court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

The Court reviews the district court's grant of summary judgment *de novo*, drawing all reasonable factual inferences in Plaintiffs' favor. *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022).

## II. *Bruen* makes clear that the Second Amendment requires a categorical approach based on text and history.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed" U.S. Const. Amd. II.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-635. The Second Amendment "is fully applicable against the States." *McDonald*, 561 U.S. at 791.

In *Bruen*, the Supreme Court reaffirmed, and clarified beyond further dispute, its holding in *Heller*, and clearly states "the standard for applying the Second Amendment":

> if "the Second Amendment's plain text covers an individual's conduct," then the government's attempt to restrict that conduct is unconstitutional, unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 597 U.S. at 24 (cleaned up).

Therefore, in analyzing Second Amendment challenges, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. Then, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

The *Bruen* Court discussed how it found in *Heller* that the Second Amendment right is not unlimited, but reiterated that in *Heller* the Court was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 21 (quoting *Heller*, 554 U.S. at 627).

In *Bruen*, the Supreme Court "directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." *Bruen*, 597 U.S. at 17. The *Bruen* Court "explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment.

“[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. 597 U. S. at 26-31, [ ]. A court must ascertain whether the new law is ‘relevantly similar’ to laws that our tradition is understood to permit, ‘apply[ing] faithfully the balance struck by the founding generation to modern circumstances.’” *Rahimi*, 602 U.S. at 692 (quoting *Bruen* at 29, and n.7).

“Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.” *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

“[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is

relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Bruen*, 597 U.S. at 26-27.

"[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 29 (citing *McDonald*, 561 U.S., at 767; quoting *Heller*, 554 U.S., at 599).

Applying these standards to this case, the lower court erred in holding that the challenged limits are consistent with the Nation's history, because the Defendants' historical analysis suffers from two fatal defects: (1) They cannot offer analogues from the appropriate *historical period*, and (2) they cannot offer "well-established and representative" historical restrictions that are closely analogous to the challenged bans, *id.* at 30. Defendants have only unrelated restrictions and vagaries, purportedly evidencing a historical tradition, but really

merely "eviscerat[ing] the general right to [keep] arms for self-defense" in precisely the manner *Bruen* prohibits, *id.* at 31.

## III. The Foster Home Ban and Day Care Home Ban are inconsistent with the Second Amendment's text and history.

Defendants cannot dispute that the conduct burdened by the rules challenged here—keeping "any lawful firearm in the home operable for the purpose of immediate self-defense," *Heller*, 554 U.S. at 635—is covered by the Constitution's plain text and thus "presumptively protect[ed]" by the Second Amendment. *Bruen*, 597 U.S. at 17. Accordingly, the burden falls to the government to justify its bans under the Second Amendment's history. When applying the relevant era of "historical tradition" to the analysis, and analyzing the purported analogies from restrictions enacted during the relevant era, it becomes clear the Defendants did not meet that burden. The lower court erroneously did so only by stretching the phrase "sensitive places" so far that it encompasses nearly everything, thus rendering the concept meaningless. Plaintiffs discusses these points below.

### A. The proper historical analysis focuses on Founding-Era restrictions, and late-nineteenth-century laws cannot be used to contradict the Second Amendment's plain meaning.

The great bulk of the Defendants' historical evidence comes from long after the ratification of the Second Amendment in 1791, *see* Charles and Rymph reports, *see also* Dkt. # 93-2, ¶¶ 37-51, 54-71 (discussing regulations enacted throughout the nineteenth century and into the twentieth). Because the key period for understanding the Second Amendment is the time of its ratification—1791—all of this later evidence is irrelevant. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw. Two principles—both established by binding and unequivocal Supreme Court precedent—necessitate the conclusion that 1791 is the critical year, not 1868—and *certainly* not historical evidence from into the twentieth century.

First, incorporated Bill of Rights provisions have the same meaning applied to the States as to the federal government. *See*

*McDonald*, 561 U.S. at 765 ("incorporated Bill of Rights protections 'are all to be enforced against the States … according to the same standards that protect those personal rights against federal encroachment' " (citation omitted)). It has been a bedrock principle of Bill of Rights jurisprudence *for over five decades* that while it is the Fourteenth Amendment that *incorporates* the Bill of Rights guarantees against the States, once incorporated, those rights have *exactly the same meaning against the States* as they do against the federal government. As the Court put the point in *Malloy v. Hogan* in 1964, the protections in the Bill of Rights are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 378 U.S. 1, 10-11 (1964). The Court has repeatedly reiterated that fundamental rule in the ensuing years, most recently *in Bruen itself*: "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 597 U.S. at 37.

Second, as *Bruen* also makes clear, the Supreme Court has always treated the ratification of the Bill of Rights as the key period for understanding the scope of the rights enumerated therein. *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011)). Almost a century ago, the Court explained that the First Congress of 1789, is "a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174-75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].").

The Defendants, through their *amicus*, have previously argued that 1868 should be the relevant date for *both* the Second Amendment's application against the States *and the federal government*.

But nothing in *Bruen* hints that the Court meant to usher in such a sea-change in incorporation doctrine. And the fact that Supreme Court precedent makes "the public understanding of [a] right in 1868 … central to whether the right was incorporated against the states" but "irrelevant" to determining the *meaning* of the right, follows directly from those principles. For while the generation that adopted the Fourteenth Amendment engaged in a robust debate about *whether* to apply the Bill-of-Rights guarantees against the States, *no one* thinks they engaged in any kind of meaningful debate over whether to *change the substantive meaning of each of those rights*.

To be sure, *Bruen* "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," and it stated that it did not "need [to] address this issue." 597 U.S. at 38. But the Court's decision not to wade into a "scholarly debate" cannot be read as changing or casting doubt on the longstanding precedent described

above. And that precedent dictates that 1791 is the critical date. Indeed, as this Court has recognized, unless and until the Supreme Court overturns one of its precedents it remains binding no matter how "wobbly" or "moth-eaten" its "foundations" have become. *See Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996), *vacated by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but stating that "[t]he Court of Appeals was correct in applying" it because "it is this Court's prerogative alone to overrule one of its precedents.").

Justice Barrett's concurring opinion in *Bruen* provides further confirmation of the point. Justice Barrett strongly suggested that "Reconstruction-era history" is "simply too late," and she cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." 597 U.S. at 82-83 (Barrett, J., concurring). Here, however, Defendants' "evidence" offers nothing but such attempts at freewheeling.

The *Bruen* majority opinion—despite its aside about not wading into the "scholarly debate" on the issue—is fully consistent with Justice

Barrett's analysis. For the majority, too, treated evidence surrounding 1791 as generally dispositive of the contours of the Second Amendment. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. That is why courts "must … guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' " *Id.* at 36 (quoting *Heller*, 554 U.S. at 614).

In fact, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36.

The Seventh Circuit's precedent leads to the same conclusion. While the Court initially suggested in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)that 1868 was "the relevant historical moment," *Id.* at 701, that Court subsequently departed from that mistaken proposition, holding in *Moore v. Madigan* that "1791" was "the critical

year for determining the amendment's historical meaning, according to *McDonald*." 702 F.3d 933, 935 (7th Cir. 2012). And while nineteenth-century history can be considered for the purpose, as *Bruen* described it, of "mere confirmation" of the original meaning established based on evidence contemporaneous with "the ratification of the Second Amendment." 597 U.S. at 37, it cannot serve as a main source. As *Moore* held, the Second Amendment's ratification in 1791 is "the *critical* year for determining the amendment's historical meaning." 702 F.3d at 935 (emphasis added). And as *Bruen* held, "to the extent later history contradicts what the text says, the text controls." 597 U.S. at 36.

### B. Modern firearm restrictions must be closely analogous to historical restrictions, and the inquiry into historical analogues does not give the State a regulatory blank check.

*Bruen* also contains clear instructions governing *how closely modern restrictions must match* historical restrictions to pass muster: while "a modern-day regulation" need not be "a dead ringer for historical precursors," the process of analogical reasoning does not give the government "a regulatory blank check," and "courts should not uphold every modern law that remotely resembles a historical

analogue." 597 U.S. at 30 (cleaned up). While this was illuminated further in *United States v. Rahimi*, 602 U.S. 680, 692 (2024), it did not alter this rule.

Further, the Supreme Court recently held that "[e]ven when a law regulates armsbearing for a permissible reason," [ ], 'it may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding.' " *United States v. Hemani*, 146 S. Ct. 1677, 1692 (2026) (quoting *Rahimi*, 602 U.S. at 692).

The Court set forth "two metrics" to guide the inquiry into what types of "regulations [are] relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* (cleaned up). And the process of reasoning by historical analogy *is not* "an invitation to revise" the "balance struck by the founding generation" "through means-end scrutiny." *Id.* at 29, fn7.

. It is true this Court in *Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025) stated that "[s]ome place-based restrictions will look much like those in the past. (Think of a rule banning firearms at a daycare.)" *Schoenthal*, 150 F.4th at 911. However, the Court did not explain this *dicta* further, and offered no examples.

The Defendants have not offered examples, either, and neither did their experts. Just as the Supreme Court recently struck down a Hawaii law – which prohibited anyone from carrying a firearm onto private property open to the public without the express consent of the owner - as violative of the Second Amendment when the government's proffered analogies did not satisfy the "why" element of the *Bruen* analysis, *see Wolford v. Lopez*, 146 S. Ct. 2032, 2050-52 (2026), the Defendants' analogies are likewise unsupportive.

Justice Barrett discussed the government's proffered analogues in *Wolford* as well, noting that even though the government claimed the claimed "why" was about protecting property rights, though the analogues were really about poachers. *Id.* at 2056 (Barrett, J.,

concurring). But that was not even the real problem with the argument, as Justice Barrett wrote:

> So the problem with Hawaii's default rule is not that it targets a regulatory problem besides poaching. It is that the rule does not target any particular abuse of firearms at all. Rather than identifying a specific threat to public peace and safety, Hawaii admits that it enacted the rule because many of its citizens oppose the public carry of guns. In other words, Hawaii is responding to the general danger associated with the presence of firearms, not to any specific, heightened risk of their misuse.

*Id.* at 2058 (Barrett, J., concurring).

Similarly, the restrictions at issue have nothing to do with any abuse of firearms. In this suit, Plaintiffs request the ability to store a loaded firearm in a safe or on one's person for self-defense purposes. In the daycare context, Plaintiffs should be allowed to possess a handgun in a locked safe for self-defense purposes, instead of having to remove it from the premises every morning. This case has never been about storing firearms in an unlocked manner or leaving it in the open. As *Heller* ruled, the requirement of keeping one's firearm non-functional is insufficient for self-defense purposes and is therefore unconstitutional.

This should apply equally to the trigger lock discussed in *Heller* and the storage requirements in this case.

Therefore, this case is governed by *Bruen*'s directive that where the government adopts a regulation "that the Founders themselves could have adopted," the historical inquiry is "relatively simple": if no closely analogous regulation is part of our Nation's history, it is unconstitutional. 597 U.S. at 27.

### C. The challenged bans are not justified by any historical tradition of firearm regulation.

Once *Bruen*'s instructions governing the proper application of its text and history standard are kept in mind, the Defendants cannot conjure any historical justification for the challenged bans, and any such efforts fall apart when the appropriate analysis is applied. "At this step of the *Bruen* analysis, the government bears the burden of demonstrating that the challenged handgun regulations are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

The only colonial era firearm restrictions offered by Defendants were regulations aimed at fire suppression. Dkt. # 93-2, ¶¶ 72-74. On top of that, even Defendants' other opinion witness Dr. Rymph could not opine that the colonial masters of the indigent indentured children were disarmed. In fact, she said, the opposite was probably true, given that there was a war. Dkt. # 93-2, ¶ 41.

Though not binding on this Court, the Wisconsin Appellate Court recently addressed this issue. In *Lafferty v. Pertl*, 2026 Wisc. App. LEXIS 885 (July 31, 2026), licensed foster parents challenged firearm restrictions which were very similar to those in this case. *Id.* at ** 9-13. However, rule and policy changes at the state and local level during the litigation mooted much of the dispute (*Id.* at *51), and by the time the case was decided the relevant remaining question was whether the following storage requirement was constitutional:

> (3) SAFE STORAGE OF FIREARMS. A foster parent who is not actively using, transporting, or cleaning a firearm, or exercising their right to carry a concealed handgun under sub. (5), shall store the firearm as provided in par. (a) and either par. (b) or (c) as follows:

> (a) Unloaded and locked in an area that is not readily accessible to a foster child.
>
> (b) With one or more of the following secondary safety measures used:
> 1. Ammunition is locked in a container separate from the firearm.
> 2. Trigger lock is engaged on the firearm.
> 3. Cable lock is engaged on the firearm.
>
> (c) In a gun safe made of steel with a secure functioning biometric, electronic, or combination locking mechanism that is designed to store [*49] firearms and ammunitions. Ammunition may be locked in the gun safe with the firearm.
>
> Wis. Admin. Code § DCF 56.076(3)(a)-(c) (emphases added).

*Lafferty*, 2026 Wisc. App. LEXIS 885 at *87. In some respects, the Wisconsin rule was less restrictive than Illinois's, such as allowing firearm and ammunition to be kept in the same locked safe) but in other ways equally or more restrictive, such as keeping the safe in a second locked area, even though the State and the Court interpreted the rule's plain language differently. *Id.* at *93.

Ultimately, the *Lafferty* Court concluded that the state's requirement the foster parents store their firearms unloaded was an

unconstitutional Second Amendment violation under *Bruen* and *Wolford*, because the state "failed to present a 'historical analogue in purpose and operation,' *see*—the "why" and "how"—related to the regulation of firearms in foster homes.. *See Lafferty*, 2026 Wisc. App. 885 at *125 (quoting *Hemani,* 146 S. Ct. at 1686).

The reasoning and analysis of the *Lafferty* Court is sound and instructive, applying the most recent Second Amendment cases from the Supreme Court, and the same result should be reached here.

### D. Neither foster homes nor home day cares qualify as "sensitive places."

The lower court in concluding that foster and daycare homes were "sensitive places" simply because they have children in them and are "educational." There is no evidence that one's home – the core of the Second Amendment right per *Heller* - was *ever* considered a sensitive place. Defendants' own witnesses have no such information (*See* Dkt. #93-2 at ¶¶ 41, 52, 53), except when dealing in unsupported hypotheticals.

One set of historical restrictions—mentioned in *dicta* in *Heller* and "assumed" to exist by *Bruen*—is comprised of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). *Bruen* identified a "few 18th- and 19th- century 'sensitive places' "—"legislative assemblies, polling places, and courthouses"—and suggested that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* The district court relied upon this passage, but it ignored the key limits in *Bruen* that completely foreclose this argument, not to mention the fact that Defendants' witnesses do not support the argument, either.

1. Beginning with *Bruen*'s first metric, the "burden on the right of armed self-defense" posed by the bans challenged here and the "sensitive place" restrictions identified in *Bruen* are not even remotely comparable. *Id.* at 29. The difference is both spatial and temporal, and it is stark. The spatial difference can be described in terms of the

Second Amendment's text: while the restrictions identified in *Bruen* limited "the *carrying* of firearms in sensitive places," *id.* (emphasis added), the bans here bar law-abiding citizens from *keeping* them—in *their own homes*. Even the Seventh Circuit's recent application of the "sensitive places" doctrine to public transportation does not aid Defendants here. *See Schoenthal*, 150 F.4th 889. In *Schoenthal*, the Court held that "a regulation does not offend the Second Amendment because it is consistent with our historical tradition when it: 1) temporarily regulates the manner of carrying firearms; 2) in a crowded and confined space; 3) where that space is defined by a natural tendency to congregate people in greater density than the immediately adjacent areas; 4) that space furthers important societal interests; and 5) the presence of firearms in that space creates a heightened risk to maintaining public safety." *Id.* at 919. Plaintiffs cite that holding to contrast it with the present situation, and emphasize that *none* of that applies to the home. Even the *Schoenthal* Court admonished that "[w]e stress that lower courts should not employ this summary of today's decision as a test in all Second Amendment challenges. '[C]ommon

sense' informs the *Bruen* inquiry." *Id.* at 918-919 (citing *Rahimi*, 602 U.S. at 698). Here, common sense shows that one's home, with or without children in it, is nothing like public transportation, or a polling place, or a courthouse, nor – comparing to the examples cited by the Defendants' witnesses – even a school. The *Schoenthal* Court upheld the public transportation firearm restriction by labeling it a "crowded and confined space," which cannot reasonably be applied to someone's home. Even the *Schoenthal* Court noted that "[w]e see no sign that the lawfulness of this rule, which was enacted within the lifetimes of the generation that fought the Revolutionary War and ratified the Bill of Rights, was subject to dispute. *Bruen*, 597 U.S. at 30 (advising that a key concern is to avoid upholding laws that 'our ancestors would have never accepted') *Schoenthal*, 150 F.4th at 912 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). The Defendants have offered no indication that our ancestors would have allowed prohibiting Second Amendment rights in one's home – with or without the presence of children. However, the lower court placed outsized emphasis on *Schoenthal* and reached the opposite conclusion.

As should be dispositive, Defendants' own opinion witness Patrick Charles would not include one's home in his definition of "sensitive places." Dkt. # 93-2 at ¶ 52. Further, none of the colonial laws regarding "sensitive places" cited by Charles involve people's homes. *Id.* at ¶ 53. For good reason – if the home became a "sensitive place," the Second Amendment would be nullified.

The lower court demonstrated this when it equated a foster home and a day care home to a school, because "foster homes are overwhelmingly dominated by the presence of children, just as schools are." SA 61. The lower court also held that foster homes are "learning environments," just like schools, because "Many of the developmental opportunities that foster care home licensees must provide directly involve the home: sibling relationships, play dates, household chores, food choices, spending money, discipline and behavioral management, and hobby preferences among indoor and outdoor recreation, sports, art, and music." SA 57. Under such logic, there is literally nowhere that is not a "learning environment" for a child: a supermarket, a restaurant, a city street, a grassy field, a forest, an after-school job, a friend's house –

since children are always learning, everywhere becomes a "sensitive place" under such a standard. Of course this cannot be correct. This case is not about public places where children congregate – schools, playgrounds, youth sporting events, *etc...* By conflating a home with foster children to a school because there are children learning things, the district court has erroneously made the "sensitive places" doctrine mean everything and nothing at the same time.

Further, "[t]here must be a clear connection between the nature of the crowded space and the resulting problem of allowing firearms, which is best proved by analogue regulations that address comparable problems in similar spaces." *Schoenthal*, 150 F.4th at 915. There is no evidence for such a connection. Even Dr. Matthew Miller, the Defendants' pre-*Bruen* expert, testified at deposition that he had no information about firearms and children under IDCFS authority (Dkt. #89-10; 85:9 – 87:16; 90:4-16). The lower court's description of foster homes as heavily regulated because of the State regulating such things as requiring them to have such items and smoke detectors, first aid kits, and prominently-posted emergency numbers, and to keep drugs

and tools out of kids' reach, is particularly tenuous. SA 60-61. Plaintiffs are not disputing common safety protocols; they are disputing the unconstitutional stripping of their right to self-defense in the name of safety, a means-end result prohibited by *Bruen*.

This distinction entails a further difference as to *when* the restrictions apply. Limits on carrying arms in specific public places, by definition, only apply for as long as an individual is in one of those places—and the individual can avoid the disability by avoiding those places. Because the restrictions here apply to the home, however, they apply whenever the individual is home and cannot be avoided in this way.

Dr. Rymph admits that for her entire detailed history of indigent child care, she knows nothing about whether the caretakers/masters had firearms. Dkt. # 93-2 at ¶¶ 34, 41-42. She assumed they did possess firearms in the colonial era, since there was a war going on. *Id.* at ¶ 41. Indeed, the one thing that stands out in Dr. Rymph's testimony is that the colonial and antebellum indigent child care system had very little to do with the child's welfare at all, just whether they could be "useful"

and perform labor. *Id.* at ¶ 32-33. The idea that the master would have been disarmed for the benefit of the indentured servant is not credible.

As to one of the topics discussed by Patrick Charles, the burden posed by the challenged bans is also unlike any historical restriction on carrying of firearms in schools for an independent reason: while some Founding-Era rules restricted *students* from carrying firearms on school grounds, even Charles could cite to no example which extended such limits to *teachers or other adult school employees* in their homes. *Id.* at ¶¶ 63-64. That is a massive difference in the "burden on the right of armed self-defense" posed by the two types of restrictions. *Bruen*, 597 U.S. at 29. And while *Bruen* did not discuss the nuances of an issue, and only mentioned the issue in passing, that shows the *Bruen* Court did not at all settle all of the details of the permissible scope of firearms restrictions in schools as a matter of binding precedent. The lower court ignored all this.

Charles described 'sensitive place' firearm prohibitions at public and some private schools as a turn of the twentieth century phenomenon. Dkt. #93-2 at ¶ 66. While Charles described firearm

restrictions on minors as among the most widely adopted laws in the country from the mid to late 1850s through the close of the twentieth century, they referred to restrictions on minors purchasing and possessing and using firearms. *Id.* at ¶ 70. None of that is at issue in this case, and in any event Charles's historical offering is from the wrong era, about 80-100 years too late.

As noted, Defendants attempted to show that teachers *were* prohibited from carrying in schools, but the only evidence they come up with are a few random 1870s-era school rules (Dkt. # 89-11 at p.30). These rules also come far too late to be of any use in interpreting the Second Amendment; indeed, the Supreme Court in *Bruen* held that a similar Texas statute from this period, and case-law upholding it, were "late-in-time outliers" entitled to little weight. 597 U.S. at 70; *see also id.* at 65. Also, nothing in them prohibits teachers from possessing firearms in their homes. Charles's scattered examples from well after the relevant era do not bear on the scope of the Second Amendment.

The analogy to schools fails for both foster and day-care homes, but the fact that Defendants did not *even claim* the analogy extended to

foster homes before *Bruen* was decided demonstrates the weakness of that particular comparison. Defendants also cannot escape the fact that even their own expert on the foster care system cannot say that those charged with the care of indigent children were disarmed – no matter the era, and no matter what form the child care took – and in fact, the opposite was almost certainly true.

2. The *justifications* of the Foster and Day-Care Home Rules here also differ markedly from Defendants' claimed historical analogues. Again, most of the Founding-Era "sensitive place" restrictions concerned locations where *government officials engaged in lawmaking or other government functions*—"legislative assemblies, polling places, and courthouses," *Bruen*, 597 U.S. at 30—and the justification for those limits were obviously to *safeguard those government functions*. That justification has no application here.

Nor is a claimed justification for Founding-Era restrictions on carrying firearms in schools comparable. That is obvious from the key distinction already discussed: they almost universally applied *only to students*. The justification behind those limits is thus plain to see: the

fear that the students attending one of the schools in question would *misuse* firearms if they were allowed to carry them to school. Given that these limits did not apply to teachers, the justification *cannot* have been the supposed risk to public safety posed by *teachers and other adults* having access to firearms (even if safely locked away and inaccessible to any students).

Defendants have attempted to get around this difficulty by describing their interest more abstractly, as protecting the health and safety of children. But if one is allowed to describe a restriction's justification at this abstract a level of generality, then it will be no trick to justify *every conceivable* modern firearm restriction as "analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30-31. After all, the overarching justification for virtually *every* historical restriction was "protecting the public health and safety." At that level, *Heller*, *McDonald*, and *Bruen* were all wrongly decided, since the restrictions at issue were *all* justified by historical analogues. *Bruen* directly repudiates such an approach. 597 U.S. at 29, fn7 ("courts may [not]

engage in independent means-end scrutiny under the guise of an analogical inquiry").

The *Schoenthal* discussed four sensitive places – schools, polling places, courthouses, and legislative assemblies. The Court found that "[w]hat happens within these places means that there is a pre-existing vulnerability or societal tension that would be exacerbated by the presence of firearms. And crucially, they are a list of dispersed places within a community, not the community itself, so regulation deprives the Second Amendment right only for a limited time. *Schoenthal*, 150 F.4th at 910. The district court held that people's homes fit in this category if they have children in them. This ruling disregards *Heller*, and erases the Second Amendment right. This is not hyperbole – if the place where the Supreme Court held the need for the Second Amendment right was the most acute (*see Heller*, 554 U.S. at 628) is a "sensitive place" where that right can be extinguished, then anywhere can be a sensitive place. If someone's home is not actually "the community," but just a "dispersed place[] within a community," then the right found in *Heller* is meaningless, subject to the whims of

policymakers. The *Schoenthal* Court held that "the sensitive places doctrine tells us that the appropriate balance allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." *Schoenthal*, 150 F.4th at 910, but people's houses are neither.

The *Schoenthal* Court noted that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Schoenthal*, 150 F.4th at 907 (quoting *Bruen*, 597 U.S. at 27). But then the *Schoenthal* Court stated that "[t]he *Bruen* inquiry accordingly recognizes that 'cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach' to drawing historical analogies." *Schoenthal*, 150 F.4th at 907 (quoting *Bruen*, 597 U.S. at 27). Apparently, public transportation met that standard, but the presence of children in peoples' houses surely does not.

In order to conclude otherwise, the district court repeatedly expanded the doctrine beyond that which is allowable. Instead, the

district court should have heeded *Schoenthal*'s warning that "[t]o be clear," this is not a 'regulatory blank check' to use security fears to justify any firearm restriction. *Schoenthal*, 150 F.4th at 910 (quoting *Bruen*, 597 U.S. at 30).

The *Schoenthal* Court summed up its ruling as follows:

> …[A]ll we find necessary to decide in rendering today's decision is that a regulation does not offend the Second Amendment because it is consistent with our historical tradition when it: 1) temporarily regulates the manner of carrying firearms; 2) in a crowded and confined space; 3) where that space is defined by a natural tendency to congregate people in greater density than the immediately adjacent areas; 4) that space furthers important societal interests; and 5) the presence of firearms in that space creates a heightened risk to maintaining public safety.

*Schoenthal*, 150 F.4th at 918-919. None of these apply to a person's home, regardless of whether children are present.

"The Supreme Court has provided a non-exhaustive list of "sensitive places" to use as material for analogical reasoning, and beyond that, there is a more expansive tradition of regulations pertaining to confined and crowded places. [*Bruen*, 597 U.S.] at 30." *Schoenthal*, 150 F.4th at 907. Clearly, the *Heller* Court did not include

the home as a sensitive place, even while being presumably aware that sometimes there are children in a home, which may belong to the homeowner, or which may not be the offspring of the homeowner but may be there for other reasons: play-date, birthday party, babysitting, slumber party, study session, dating, visiting relatives, fostering, and many others. The Supreme Court in *Heller* could have made the presence of children a factor in recognizing the core Second Amendment right of protecting home and hearth, but did not. Among other reasons, there is no historical basis for it, either in 1789 or in 1868. Defendants' experts pointed to nothing, and it seems very obvious that the Framers' generation was far more concerned with limiting gunpowder as a means of fire suppression than in disarming residents because they had children. This point cannot be overlooked: the Supreme Court specifically made references to firearms in "sensitive places" at the same time it specifically protected firearm ownership in the home. To equate the two, even in analogy, is inapt and directly contradicts the Supreme Court.

The Millers' home is no more a sensitive area than it is when natural or adopted children are in the home. It is extremely disingenuous to compare someone's home to a school or government building just because a foster child is/could be placed there, or there is a home daycare there.

Defendants should no more be allowed to tell people to disarm in their own homes than it can prohibit certain books, or Internet sites, or religious practices[2], or political lobbying, or the right to remain silent in the face of police questioning. Arguably, Defendants could find some reason why "safety of children" would be aided by these infringements, but of course they would be wholly unconstitutional. "The Second Amendment does not vanish in the presence of children." *Schoenthal*, 150 F.4th at 917. And such an argument bears reminding that "the particular problem motivating a firearm ban in the Chicago Loop would be little more than the innate risk of firearms in society, which is inconsistent with the "balance struck by the founding generation....' " *Schoenthal*, 150 F.4th at 918 (quoting *Bruen*, 597 U.S. at 29, fn7).

[2] For themselves, as opposed to not including a foster child in a foster parent's religious practices when the child or the biological parents object.

The *Lafferty* Court also held that foster homes are not "sensitive places." The *Lafferty* Court noted that "[t]his issue has been addressed in other jurisdictions. See *Johnson v. Lyon*, 406 F. Supp. 3d 651, 666-67 (W.D. Mich. 2018) which held:

> [p]ublic areas fall within the "sensitive place" exception because they are important to the function of government or because the possessing firearms in such places risks harm to great numbers of defenseless people ....
>
> Foster homes are obviously not such a place. They are homes. And considering one's home a "sensitive area" would eviscerate *Heller*'s clarification that "the need for defense of self, family, and property is most acute" in the home. Certainly, a foster home—like any other home—is not a place where "great numbers of defenseless people" are found.

*Lafferty*, 2026 Wisc. App. 885 at **71-72, fn51.

Also, if a man's home is his castle (*See Semayne's Case*, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1604) ("the house of every one is to him as his castle and fortress" and the home is privileged for the homeowner, "his family," and "his own proper goods." *Id.* at 91b, 93a, 77 Eng. Rep. at 195, 198); *see also Minnesota v. Carter*, 525 U.S. 83, 100 (1998), then

the Defendants' position is not only legally flawed, but it strips the owner of the ability to defend that castle.

The district court also thought the burden on Second Amendment rights less severe because "relatively few people are affected" by the challenged rules, *see* SA 41, 65, but that is plainly unsound. The question is the effect of the challenged rule on those people who are affected, not the number of people affected. In other words, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894 (1992). Else, an unconstitutional law imposed by Peoria would be subject to lesser constitutional scrutiny than the same law imposed by Chicago, simply because the population of the latter jurisdiction is larger. That is not how constitutional rights work.

## IV. The Forced Abandonment of Second Amendment Rights by Foster Parents and Home Daycare Operators is an Unconstitutional Condition of Obtaining Such a License.

In addition to erring by concluding the Defendants' restrictions and prohibitions are consistent with the Second Amendment's text and

history, the lower court also committed reversible error by concluding that Defendants' "broad powers over . . . contractors who carry out governmental functions" included the Government being able to simply cancel Plaintiffs' Second Amendment rights. This second justification for the infringement of Plaintiffs' rights fails just like the first, and the lower court must also be reversed for ruling otherwise.

A. As an initial matter, Plaintiffs are not government employees. The lower court conflated Plaintiffs with the foster **agencies** the government had contracted to do its vetting and placements. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 529-30 (2021). It is the agency that is the government contractor, not the foster family. And home daycare has nothing to do with the State, except that the State decided it was something that required licensing. There is no argument to be had that by operating a daycare in her home, that Jennifer Miller is a government employee or contractor.

As already noted, the firearm restrictions at issue in this case, considered in regard to their effect on the law-abiding citizens they bind, are indistinguishable from those in *Heller*: they have the effect of

banning those citizens from having handguns in the home and from having any firearm that is "operable for the purpose of immediate self-defense." *Heller*, 554 U.S. at 635. And apart from the fact that the day care home restrictions are limited to "designated spaces for the care of young children," —a feature that does not exempt them from Second Amendment scrutiny—the only remaining material difference between the restrictions here and those in *Heller* is that the bans in this case apply only to individuals who in a sense "are government contractors," who "have chosen to apply for a Day Care Home [or Foster Care] License" and who, thus, "can regain their undiminished Second Amendment rights by ceasing to provide the child care services for which licensure is required." The district court held that this distinction critically affected the Second Amendment analysis, but that was error.

Under the "unconstitutional conditions" doctrine, it has long been settled that the State "may not impose conditions which require the relinquishment of constitutional rights." *Frost v. Railroad Comm'n of Cal.*, 271 U.S. 583, 594 (1926).

That rule "is premised on the notion that what a government cannot compel, it should not be able to coerce." *Planned Parenthood of Ind., Inc. v. Commissioner of Ind. State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012) (quotation marks omitted).

After all, "[i]f the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Frost*, 271 U.S. at 594. Accordingly, just as the Second Amendment bars Illinois from directly prohibiting Plaintiffs from possessing operable firearms in their home, it in equal measure bars them from trying to buy that right away from Plaintiffs—in exchange for a license that only the State can grant and that "may be vital to [their] livelihood." *Id.* at 593.

The Supreme Court's decision in *Fulton* confirms the point. There, too, the government sought to excuse an alleged infringement of foster caregivers' constitutional rights on the basis that "governments should enjoy greater leeway . . . when setting rules for contractors because

"when individuals enter into government employment or contracts, they accept certain restrictions on their freedom as part of the deal." 141 S. Ct. at 878. The Supreme Court took a different view, noting that constitutional principles "still constrain the government in its capacity as manager," and it struck the challenged government actions down. *Id.* The district court cited *Fulton* —and even though that case held the challenged licensing requirement for foster care unconstitutional, the lower court then reached precisely the opposite conclusion, with no explanation of how that conclusion could be squared with *Fulton*. It cannot.

The few precedents that the district court did rely on do not support its conclusion. It cited *Garcetti v. Ceballos* for the proposition that "statements made by government employees pursuant to their professional duties are categorically unprotected by the First Amendment," SA 77, but as *Garcetti* itself explains, that proposition has nothing to do with the doctrine of unconstitutional conditions; rather, it is based on the principle—plainly inapplicable here—that "when public employees make statements pursuant to their official

duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. 410, 421 (2006).

The court below also relied on the district-court opinion in *Van Dyke v. Fultz*, 2018 WL 1535141 (N.D. Ill. Mar. 29, 2018), which concerned a foster caregiver's Section 1983 challenge to a warrantless search of her foster home. The court dismissed the challenge, but its decision is inapplicable here for multiple independent reasons: (1) it upheld the search under qualified immunity, not on the merits; (2) rather than applying the "unconstitutional conditions" doctrine, or relying on the foster parent's status as a government contractor, it applied precisely the same Fourth Amendment analysis that would govern any other search; and (3) it ultimately upheld the search under longstanding Fourth Amendment jurisprudence regarding the scope of consent to warrantless searches—jurisprudence that is entirely irrelevant in this case. *Id.* at *3–*4.

Defendants argue that the *Bruen* test does not apply to its argument, because its "wide latitude" over government contractors is apparently some sort of super-constitutional rule—a "general principle"

that applies to *every* constitutional right. Dkt. #89 at p.37. None of the cases they cite clearly establishes that proposition—as opposed to the more mundane conclusions that as a matter of the substance of First Amendment free speech law, *see Garcetti*, 547 U.S. at 423, procedural due process, *Coyne-Delany Co., Inc. v. Capital Dev. Bd.*, 616 F.2d 341, 343 (7th Cir. 1980), or the purported "constitutional right to informational privacy," *NASA v. Nelson*, 562 U.S. 134, 146 (2011), the analysis is different in certain ways if the plaintiff is a government employee or contractor.). The Defendants have not carried their burden of establishing any similar rule under the "the standard for applying the Second Amendment": whether such a rule "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The lower court equated all of these and more, but none of the other cases cited by Defendants or the lower court involve the *Bruen* standard.

The lower court also cited to *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006), but a law that tied federal funding for law schools to their allowing equal access to military

recruiters as with other recruiters has absolutely nothing to do with the present case. The *Rumsfeld* Court found the law schools were not being denied their First Amendment right to free speech because they were not speaking, the recruiters were. *Id.* at 60. That is clearly not the situation here; the Second Amendment rights of the foster parents and daycare operators are directly infringed.

The lower court denied it was employing a rational basis test, which would be improper under *Heller*, but then used a "reasonableness" test, which is the same thing. SA 100. That proposition allows the Government to help itself to functional rational basis review for any constitutional infringement, and is flatly contrary to the rationale of the unconstitutional conditions doctrine. As explained, that doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). The Constitution would not be vindicated in the slightest if the only result of the doctrine were to require, in the face of a government rule "awarding or withholding a public benefit for the

purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right," *Planned Parenthood of Ind.*, 699 F.3d at 986, the application of rational basis review—the very analysis that would apply anyway, under "the separate constitutional prohibitions on irrational laws," *Heller*, 554 U.S. at 628 n.27.

The lower court propped up this "rational basis" theory by citing an aside in this Court's decision in *Burgess v. Lowery* to the effect that "conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right, such as the right to be free from unreasonable searches and seizures—provided the conditions are reasonable." 201 F.3d 942, 947 (7th Cir. 2000) (Posner, J.). That passage was the purest of *dicta*. And in any event, it did not clearly impose a "rational basis" test in the unconstitutional-conditions context—instead, it suggested that any conditions must be "reasonable," a suggestion best read as limited to the Fourth Amendment context specifically at issue in *Burgess*, where the underlying constitutional standard is itself "reasonableness." Again, that is the only reading of this opaque and gratuitous passage from

*Burgess* that is consistent with the nature and purpose of the unconstitutional conditions doctrine.

B. Further, this argument fails because the Defendants failed to show that it has any support in the Second Amendment's text or history. *Bruen* could not have been clearer that "the standard for applying the Second Amendment" is that where the Constitution's "plain text covers an individual's conduct, … [t]he government *must* then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 25 (emphasis added). The Court did not announce a "government contractor exception" to that rule, and this Court should not create one. Defendants make no attempt to show, on the basis of "the Nation's historical tradition of firearm regulation," *id.*, that it enjoys "broad powers" to limit the Second Amendment rights of government contractors, Dkt. #89 at p.37, and so that assertion must be rejected under *Bruen*'s square holding.

C. Even if Defendants had established the existence of a general principle that the government may impose conditions on

contractors that nullify their Second Amendment rights, the "general principle[s]" that control government restrictions in this context in fact refute Defendants' claim. The Supreme Court rejected the same argument in the context of the Free Exercise Clause in *Fulton*. There, too, the government argued that it "should enjoy greater leeway under the [Constitution] when setting rules for contractors than when regulating the general public." *Fulton*, 141 S. Ct. at 1878. The Court rejected that assertion, concluding instead that constitutional limits "still constrain the government in its capacity as manager." *Id.* The Court was unequivocal: "We have never suggested that the government may discriminate against religion" - the constitutional violation at issue in *Fulton* - "when acting in its managerial role." *Id.* The *Fulton* ruling repudiated the Defendants' claimed overarching principle that constitutional limits do not "constrain the government in its capacity as manager." *Id.* And more generally, this repudiation is in accord with the longstanding rule, across a variety of contexts, that the State "may not impose conditions which require the relinquishment of constitutional rights." *Frost*, 271 U.S. at 594. Defendants cannot dispute either the

existence of this principle or that it applies in the Second Amendment context (at least to the same extent that Defendants' own "general principle that the government may impose conditions on contractors" does).

Instead, Defendants have advanced – and the lower court adopted - a number of arguments designed to make the unconstitutional conditions doctrine less protective. The principal one relies on *dicta* from this Court's decision in *Burgess* suggesting that "conditions ... may include the surrender of a constitutional right" so long as they "are reasonable." 201 F.3d 942, 947 (7th Cir. 2000). However, *Burgess*'s reference to conditions that are "reasonable" did not clearly impose a "rational basis" test in the unconstitutional-conditions context—instead, it suggested that any conditions must be "reasonable," a suggestion best read as limited to the Fourth Amendment context specifically at issue in *Burgess*, where the underlying constitutional standard is itself "reasonableness." That is the only reading of this opaque and gratuitous passage from *Burgess* that is consistent with the nature and purpose of the unconstitutional conditions doctrine. And even setting those points

aside, any "reasonableness" standard that existed before *Bruen* surely cannot apply in the Second Amendment context now, given that decision's deliberate repudiation of this type of approach.

Indeed, the lower court's acceptance and lengthy discussion of the social-science evidence the Defendants introduced before *Bruen* was decided makes clear the lower court resurrected and adopted the very "means-end scrutiny" approach that *Bruen* squarely rejected, 597 U.S. at 23.

Switching gears, Defendants articulated a second (similarly weak) interpretation of the unconstitutional-conditions doctrine, as requiring only that a government's demand that its contractors surrender their constitutional rights be "part and parcel" of some government program or benefit. But as the cases Defendants cite make clear, this "part and parcel" inquiry is not the test for determining whether a government-imposed condition is unconstitutional; it is the test for determining whether the Government's decisions about how far to extend its spending programs should be assessed under the "unconstitutional conditions" doctrine or the "speech subsidy" line of cases. *See Camelot*

*Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 24 F.4th 640, 650 (7th Cir. 2022) (discussing how to "distinguish between permissible limits on spending programs and unconstitutional conditions"); *Daunt v. Benson*, 956 F.3d 396, 412 (6th Cir. 2020) (noting that the "part and parcel" inquiry arises from "the Supreme Court's government-funding cases"). This inquiry is inapposite in this case, which does not involve speech subsidies.

The lower court also accepted Illinois's invocation of its status "as the legal guardian for children in the foster care system." SA 78. This adds nothing but rhetorical flourish. No one questions the gravity of the State's interest in "protecting foster children and providing for their safety," SA 85—just as no one denies the compelling nature of the State's interest in ensuring public safety generally. And it bears emphasis that this case does not concern the limits that a State, acting as guardian, may place on the children within its custody. But when the State seeks to limit the freedom of the *adults* it contracts with to provide foster care, it must do so consistent with the Constitution's guarantees—including the principle that "what a government cannot

compel, it should not be able to coerce," *Planned Parenthood of Indiana*, 699 F.3d at 986.

The short of the matter is this: under longstanding constitutional principles, just as a State cannot mandate that its law-abiding adult citizens refrain from keeping "any lawful firearm in the home operable for the purpose of immediate selfdefense," *Heller*, 554 U.S. at 635, unless that directive is justified as consistent with the Second Amendment's text and "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, it cannot buy that right away from its contractors unless it makes the same showing.

Further, there is no slippery slope here. Nothing Plaintiffs have said calls into doubt the existing law interpreting other constitutional provisions that, for example, allows the government to impose limits on the official speech of its employees under the First Amendment, *see Garcetti*, 547 U.S. at 423, or concludes that reasonable searches of foster homes are consistent with the Fourth Amendment, *Van Dyke*, 2018 WL 1535141, at *4. But Defendants have failed to show that "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at

17, allows it to impose special limits on its contractors' Second Amendment rights.

Defendants also argue that the Foster Home Ban must be sufficiently related to child safety because it is "consistent with national standards," including a 2019 model rule. Dkt. #89 at 44. But the model standards they cite say nothing about foster parents carrying firearms securely on their person, see U.S. DHS, NATIONAL MODEL FOSTER FAMILY HOME LICENSING STANDARDS, https://bit.ly/3cA1Jvq, so in fact the Defendants' rules appear to be more restrictive.

The *Lafferty* Court also addressed this issue, holding that the Wisconsin foster home firearm restriction was an unconstitutional condition of obtaining a foster parenting license. "[T]he [plaintiffs] were allowed to obtain a foster home license and serve the community as foster parents to children who have been determined by our judicial system to be in need of care or support. There is no connection—much less a "rationally related" one—between being foster parents and surrendering rights guaranteed under the Second Amendment." *Lafferty*, 2026 Wisc. App. 885 at *72.

The *Lafferty* Court further held that: "While we acknowledge that foster parents do knowingly and voluntarily waive some aspects of their constitutional rights, most especially the right to the privacy of their hearth and home by which they allow the State to determine that the premises are appropriate for the State's wards (the prospective foster children), we do not agree that the circuit court was correct when it determined the [plaintiffs] had waived significant parts of their Second Amendment rights when they agreed to serve the community and State as foster parents." *Id.* at 76. This Court should hold the same.

## CONCLUSION

The Defendants instituted Rules that forced the Millers, and every person who fosters children through the State or operates a home daycare facility, to choose between fundamental Second Amendment rights, and the ability to foster children or operate the home facility. Besides being terrible policy, it is unconstitutional.

There is no material difference between the bans at issue in this case (which bar Plaintiffs from possessing, in their own home, firearms operable for the purpose of immediate self-defense) and the bans struck

down in *Heller* (which did exactly the same thing). Accordingly, the same analysis used in *Heller* must apply, with the same result: the challenged restrictions are "off the table." 554 U.S. at 636.

In light of the above, as the Defendants cannot – under *Bruen* - support their unconstitutional prohibitions and restrictions on foster parents and home daycare licensees, and since Plaintiffs have been injured in the stripping away of their Second Amendment rights for nothing more than wanting to take care of children in need, the lower court's granting of F.R. Civ. P. 56(a) summary judgment in the Defendants' favor must be reversed, and summary judgment should be entered in the Plaintiffs' favor, or the matter should be remanded for entry of same, as well as any and all relief consistent with such ruling.

Respectfully submitted,

Dated: October 24, 2026 By: /s/ David G. Sigale

David G. Sigale

Attorney for Plaintiffs-Appellants

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547/630.596.4445 Fax
dsigale@sigalelaw.com

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,724 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2016 in 14 point Century font.

/s/ David G. Sigale
David G. Sigale

Attorney for Plaintiffs-Appellants

Dated: October 24, 2026

REQUIRED SHORT APPENDIX

TABLE OF CONTENTS

CIRCUIT RULE 30(d) STATEMENT ............................................ i

DISTRICT COURT JUDGMENT ............................................ SA 1

DISTRICT COURT OPINION ................................................ SA 2

NOTICE OF APPEAL (DATED 8/11/26) ................................ SA 118

CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) are included in the required short appendix. All materials required by Circuit Rule 30(b) are also included in the short appendix pursuant to Circuit Rule 30(b)(7).

/s/ David G. Sigale
David G. Sigale

☑

## CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on October 24, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ David G. Sigale

☐

## CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on ____________________, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

| counsel / party: | address: |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

s/______________________________

E-FILED
Tuesday, 04 August, 2026 08:51:44 AM
Clerk, U.S. District Court, ILCD



# UNITED STATES DISTRICT COURT

for the
Central District of Illinois

| | | |
|---|---|---|
| **Jennifer Miller, Darin Miller, Second Amendment Foundation, Inc., Illinois State Rifle Association, and Illinois Carry,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case Number: 3:18-cv-03085-SEM-DJQ** |
| **Kwame Raoul and Heidi E Mueller,** | ) | |
| **Defendants.** | ) | |

## JUDGMENT IN A CIVIL CASE

☐ **JURY VERDICT**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY THE COURT**. This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Plaintiffs' Jennifer Miller, Darin Miller, Second Amendment Foundation, Inc., Illinois State Rifle Association, and Illinois Carry action against Defendants Kwame Raoul and Heidi E Mueller is dismissed.

**Dated: 8/3/2026**

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

Approved: s/ Sue E. Myerscough
Sue E. Myerscough
U.S. District Judge

E-FILED
Monday, 03 August, 2026 12:38:21 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **JENNIFER MILLER, DARIN MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 18-cv-3085** |
| **HEIDI MUELLER, in her official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois,** | ) | |
| **Defendants.** | ) | |

**<u>OPINION AND ORDER</u>**

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court are Defendants Heidi Mueller's and Kwame Raoul's ("Defendants") Motion for Summary Judgment (d/e 89) and Plaintiffs Jennifer Miller's, Darin Miller's, Second Amendment Foundation, Inc.'s, Illinois State Rifle Association's, and Illinois Carry's ("Plaintiffs") Motion for Summary Judgment (d/e

94). For the reasons set forth, Defendants' Motion for Summary Judgment (d/e 89) is GRANTED and Plaintiffs' Motion for Summary Judgment (d/e 94) is DENIED.

## I. BACKGROUND

The Court draws the following facts from the parties' statements of undisputed facts and discusses any material factual disputes in its analysis.

### a. Illinois Day Care Homes

The Illinois Department of Children and Family Services ("DCFS") was created for the purpose of providing social services to children and their families, to operate children's institutions, and to provide other rehabilitative and residential services related to children and their families. d/e 89, p. 7; d/e 96, p. 3. Section 7 of the Illinois Child Care Act of 1969 requires DCFS to "prescribe and publish minimum standards for licensing" of child care facilities including day care homes and foster family homes.[1] 225 ILCS 10/7.

[1] The Illinois Department of Early Childhood ("IDEC") began operations focusing on early childhood programs and services on July 1, 2026. See IDEC Agency News, Illinois Department of Early Childhood Officially Launches July 1 as New State Agency, ILL. DEPT. EARLY CHILDHOOD (July 28, 2026),

DCFS' obligation to protect children's safety extends to day care homes. d/e 89, p. 10; d/e 96, p. 4. Illinois law requires that day care homes—businesses run out of the licensee's home where parents pay the day care licensee for child care services—have licenses from DCFS to operate lawfully. d/e 89, p. 9; d/e 96, pp. 3-4. Consistent with the Illinois legislature's grant of licensing authority, DCFS has created minimum licensing standards for day care homes. d/e 89, p. 10; d/e 96, p. 4.

Under Subsection 7(a) of the Illinois Child Care Act of 1969, DCFS is required to issue regulations including:

> (13) Provisions prohibiting handguns on day care home premises except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside on the premises of a day care home;
>
> (14) Provisions requiring that any firearm permitted on day care home premises, except handguns in the possession of peace officers, shall be kept in a disassembled state, without ammunition, in locked storage, inaccessible to children and that ammunition permitted on day care home premises shall be kept in locked storage separate from that of

---

https://idec.illinois.gov/news/2026/illinois-department-of-early-childhood-officially-launches-july-.html.

disassembled firearms, inaccessible to children;

(15) Provisions requiring notification of parents or guardians enrolling children at a day care home of the presence in the day care home of any firearms and ammunition and of the arrangements for the separate, locked storage of such firearms and ammunition

225 ILCS 10/7(a)(13)–(15).

In order to comply with §§ 7(a)(13)–(15) of the Illinois Child Care Act of 1969, DCFS has promulgated the following rules:

(17) Handguns are prohibited on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home. The licensee shall post a "no firearms" sign, as described in Section 65(d) of the Firearm Concealed Carry Act, in a visible location where parents pick up children.

(18) Any firearm, other than a handgun in the possession of a peace officer or other person as provided in subsection (a)(17), shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children.

A) Ammunition for such firearms shall be kept in locked storage separate from that of the disassembled

firearms, inaccessible to children.

B) The operator of the home shall notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises. The operator shall also notify the parents or guardian that such firearms and ammunition are locked in storage inaccessible to children. The notification need not disclose the location where the firearms and ammunition are stored.

89 Ill. Admin. Code §§ 406.8(a)(17)–(18) ("the Day Care Home Rule"). Although Plaintiffs deny that compelling compliance with the Day Care Home Rule protects children's health and safety and assert the opposite, the parties agree that the Day Care Home Rule's purpose is to protect children's health and safety by preventing death, injury, and suicide by firearms. d/e 89, p. 11, d/e 96, pp. 5-6.

Additionally, day care home licensees must allow DCFS to inspect their homes to determine compliance with the licensing standards at any time during operating hours, at least once a year. d/e 89, p. 10; d/e 96, p. 4. Day care home licensees must also comply with requirements concerning the physical facility of the day care home to ensure children's safety: storing knives, medication, scissors, and hazardous materials in places inaccessible to

children; ensuring the home is free from lead paint; refraining from smoking while children are present; ensuring that there is an outdoor space that is safe for children to play; ensuring swimming pools are inaccessible to children; and ensuring that the day care space is kept at a certain temperature, depending on the time of the year. Id.; see also 89 Ill. Admin. Code § 406.8.

DCFS designated representative Meaghan Jorgensen testified that, if a day care home licensee had a handgun on the premises outside of operating hours, he or she would not be in violation of the Day Care Home Rule. d/e 89, p. 11; d/e 96, p. 5; see also d/e 89-3, p. 64. The maximum penalty for violating the Day Care Home Rule is revocation of the license to operate a day care home. d/e 89, p. 11; d/e 96, p. 4.

**b. Illinois Foster Homes**

When DCFS is awarded guardianship of a child, DCFS receives the rights and responsibilities of legal custody and is required by law to act in the child's best interests. d/e 89, p. 7; d/e 96, p. 3. DCFS may place children in its care in a licensed child care facility, such as a foster home in DCFS' foster care program,

which the Illinois legislature has mandated must ensure child safety and protection. d/e 89, p. 7; d/e 96, p. 3.

DCFS requires that foster homes and foster parents be licensed by DCFS and subsidizes foster parents' expenses incurred in caring for a foster child. d/e 89, p. 8; d/e 96, p. 3. Among other requirements, foster care licensees must: agree to allow DCFS workers to inspect their homes, both as part of the licensing process and on an ongoing basis; refrain from making derogatory comments about the foster child or the child's family; and submit to a background check and be approved by DCFS to live in the foster home (as must all residents and potential residents of the foster home). d/e 89, p. 8; d/e 96, p. 3. Foster care licensees must also agree to store tools, medicine, and other dangerous household supplies away from young children, refrain from smoking, and maintain at least one operable fire extinguisher. d/e 89, pp. 8-9; d/e 96, p. 3.

DCFS has also promulgated the following rule regarding firearms in foster homes:

> (o) Any and all firearms and ammunition shall be stored and locked up separately at all times and kept in places

> inaccessible to children. No firearms possessed in violation of a State or federal law or a local government ordinance shall be present in the home at any time. Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

89 Ill. Admin. Code § 402.8(o) ("the Foster Home Rule").

DCFS created the Foster Home Rule to increase the health and safety of foster children by protecting them from injury and death from firearms, including by suicide. d/e 89, p. 9; d/e 96, p. 15. The maximum penalty for violating the Foster Home Rule is revocation of the foster caregiver license. d/e 89, p. 9 (citing d/e 89-3, pp. 40-45); d/e 96, p. 5.

**c. Procedural History**

Plaintiffs Jennifer Miller and Darin Miller ("the Millers") are DCFS-licensed foster parents. d/e 89, p. 25; d/e 96, p. 4. Jennifer Miller is also a DCFS-licensed day care home operator, operating a day care out of the Millers' home. d/e 89, p. 28; d/e 96, p. 4. The Millers are members of each of the three organizational Plaintiffs—the Second Amendment Foundation, the Illinois State Rifle Association, and Illinois Carry—which are membership

organizations that promote awareness of the Second Amendment. d/e 89, p. 33; d/e 96, pp. 4-5.

The Millers are in compliance with the DCFS Rules. d/e 89, pp. 28, 32; d/e 96, pp. 23, 24. But, the Millers both testified that, in the absence of the DCFS Rules, they would like to store at least one loaded firearm locked in a safe. d/e 89, p. 32; d/e 96, p. 4. Darin Miller further testified that he wishes to have the option to carry a concealed, loaded firearm on his person in his home, including during day care hours, and carry at least two loaded handguns on his person. d/e 89, pp. 32-33; d/e 96, p. 4.

On April 16, 2018, Plaintiffs filed a Complaint (d/e 1) in this Court alleging that the Day Care Home Rule was an unconstitutional restriction on the Second Amendment right to keep and bear arms. On May 29, 2019, Plaintiffs filed an Amended Complaint (d/e 19), alleging that both the Day Care Home Rule and the Foster Home Rule (together, "the DCFS Rules") are unconstitutional restrictions on the Second Amendment right to keep and bear arms. Defendants Heidi Mueller, Director of DCFS, and Kwame Raoul, Attorney General of the State of Illinois, are both sued in their official capacities. Id. at p. 1.

On November 12, 2021, Defendants jointly filed a Motion for Summary Judgment (d/e 55), as well as a supporting Memorandum of Law (d/e 56), asserting that both DCFS Rules withstood constitutional scrutiny. On March 14, 2022, this Court issued an Order (d/e 65) granting Defendants' Motion for Summary Judgment, finding that both DCFS Rules were subject to intermediate scrutiny and passed constitutional muster. See id. at pp. 25-38; 38-45.

This Court considered Plaintiffs' claims under the two-step inquiry the Seventh Circuit set forth in Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) ("Ezell I") to determine the constitutionality of state and local laws and regulations challenged on Second Amendment grounds. See d/e 89, pp. 31-38; 39-45. At the first step of Ezell I, the reviewing court was to undertake a "textual and historical inquiry into original meaning" to determine whether the restricted activity is "categorically unprotected" by the Second Amendment. Ezell I, 651 F.3d at 701, 703. At the second step of Ezell I, the Government bore the burden of "justifying its action[s] under some heightened standard of judicial review." Id. at 706 (emphasis in original). The applicable standard of review was "akin

to intermediate scrutiny" but could be more or less strict depending on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Kanter v. Barr, 919 F.3d 437, 441-42 (7th Cir. 2019) (internal citations omitted).

On March 15, 2022, this Court entered judgment accordingly (d/e 66). On March 24, 2022, Plaintiffs appealed to the United States Court of Appeals for the Seventh Circuit from this Court's Order (d/e 65) and Judgment (d/e 66). See d/e 67.

On January 20, 2023, the Seventh Circuit vacated this Court's Order (d/e 65) granting summary judgment for the State of Illinois and remanded this case to this Court for further proceedings consistent with the Seventh Circuit's order. See d/e 77. The Seventh Circuit directed this Court to allow the parties to engage in further discovery, including seeking additional expert reports, and further briefing on the unconstitutional conditions doctrine and the sensitive places doctrine. See id. at p. 3. The Seventh Circuit directed this Court to then evaluate additional motions under the text, history, and tradition framework in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022) and to consider

the interaction of Bruen and the unconstitutional conditions doctrine. See d/e 77, p. 3.

On October 4, 2024, Plaintiffs filed a Second Amended Complaint (d/e 83) against Defendants, alleging that both DCFS Rules are unconstitutional restrictions on the Second Amendment right to keep and bear arms as applied to the states under the Fourteenth Amendment. Id. at pp. 8-9, 19. Plaintiffs requested a declaration that the DCFS Rules are unconstitutional, as well as preliminary and permanent injunctions enjoining Defendants from enforcing the DCFS Rules. Id. at p. 19.

On September 5, 2025, Defendants filed a Motion for Summary Judgment (d/e 89), to which Plaintiffs filed a Response (d/e 96) on September 25, 2025, to which Defendants filed a Reply (d/e 97) on October 8, 2025. On September 8, 2025, Plaintiffs filed a Motion for Summary Judgment (d/e 94), to which Defendants filed a Response (d/e 95) on September 24, 2025, to which Plaintiffs filed a Reply (d/e 98) on October 8, 2025.

On November 12, 2025, Plaintiffs filed an advisory opinion from the South Carolina Attorney General as supplemental authority (d/e 100). On November 18, 2025, Defendants filed a

Response (d/e 102). The Court notes that the advisory opinion does not address the DCFS Rules, but another state's demonstrably different statute. See generally d/e 100.

## II. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the non-moving party. Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).

When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" Paz v. Wauconda Healthcare & Rehab. Ctr., LLC, 464 F.3d 659, 664 (7th Cir. 2006).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (internal citation omitted)). After the moving party does so, the non-moving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quotation and footnotes omitted).

## III. SECOND AMENDMENT ANALYSIS

### a. Legal Precedent.

#### 1. Supreme Court precedent on the Second Amendment.

The Second Amendment to the United States Constitution enshrines the "right of the people to keep and bear Arms." U.S. CONST., amend. II. "[T]he Second Amendment right is fully

applicable to the States." McDonald v. City of Chicago, Ill., 561 U.S. 742, 750 (2010).

Since 2008, the Supreme Court has held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." District of Columbia v. Heller, 554 U.S. 570, 635 (2008). The Supreme Court in Heller noted that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." Id. at 581. However, the Court in Heller also cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Id. at 626.

The Justices in Heller considered a District of Columbia law generally requiring residents to keep their lawfully owned firearms "unloaded and disassembled or bound by a trigger lock or similar device[.]" Id. at 575 (quoting D.C. Code § 7–2507.02). The Court ultimately found that the requirement at issue, as applied to the respondent—"that firearms in the home be rendered and kept inoperable at all times"—"makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." Id. at 630. The Court also cautioned in Heller

that its analysis should not "be taken to cast doubt on…laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" nor to "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." Id. at 626, 632.

In New York State Rifle & Pistol Association, Inc. v. Bruen, the Supreme Court built upon Heller and its other prior Second Amendment decisions to clarify its position on who the Second Amendment protects and how to determine whether a law is consistent with those protections. 597 U.S. 1 (2022). The Court restated that "the people" protected by the Second Amendment include "ordinary, law-abiding, adult citizens." Bruen, 597 U.S. at 31. The Court explained that the Second Amendment "surely elevates above all interests the right of law-abiding, responsible citizens to use arms" for self-defense. Id. at 26 (quoting Heller, 554 U.S. at 635).

The Supreme Court in Bruen also announced a new framework for analyzing Second Amendment challenges to firearms regulations. First, the presiding court must determine whether "the Second Amendment's plain text covers an individual's conduct."

Bruen, 597 U.S. at 17. "If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected." Id. at 18 (internal citations omitted).

But, if the conduct falls within the plain text of the Second Amendment, the conduct is presumptively protected. Id. at p. 17. The analysis then moves to the second step, where the government bears the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 19.

If a challenged regulation addresses a longstanding societal problem, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Id. at 26. If the Founders could have adopted a particular regulation to confront a longstanding problem and did not do so, that could suggest that the law today is unconstitutional. Id. at 27. For "modern regulations that were unimaginable at the founding," the government must produce historical evidence that is "relevantly similar." Id. at 28-29.

The Supreme Court did not provide lower courts with any

exhaustive list of features or factors to consider that would render a modern regulation similar enough to historical analogues to pass muster. Id. at p. 29. Rather, the Court directed lower courts to consider "how and why regulations burden a law-abiding citizen's right to armed self-defense"—in other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—to identify historical analogues to modern firearm regulations. Id. Citing "Heller's discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," the Bruen court found that "courts can use analogies to those historical regulations of sensitive places to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." Id. at 30 (emphasis in original) (internal quotations omitted).

In United States v. Rahimi, 602 U.S. 680 (2024), the Supreme Court heard a challenge to § 922(g)(8), which prohibits the possession of firearms by persons subject to a domestic violence restraining order. Id. at 684. The Rahimi Court clarified that the

Bruen standard should not be misunderstood to mean that modern firearm regulations require close founding-era comparators. Id. at 691-92. Rather, the Court examined both historical surety laws, which "authorized magistrates to require individuals suspected of future misbehavior to post a bond," and "going armed laws," which involved judicial determinations of whether a particular defendant was likely to threaten another with a weapon. Id. at 695-97. The Rahimi Court found that § 922(g)(8) passed Second Amendment muster because, when considering the surety and going armed laws, "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." Id. at 700.

The Rahimi Court also noted that a statute's penalty constituted a "relevant aspect of the burden" that a statute "imposes on the right to bear arms." Id. at 698-99. Because, under the going armed laws, "imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." Id. at 699. The Justices also rejected the defendant's argument that bans on firearms in the home were

categorically unconstitutional under Heller:

> Rahimi argues Heller requires us to affirm, because Section 922(g)(8) bars individuals subject to restraining orders from possessing guns in the home, and in Heller we invalidated an "absolute prohibition of handguns ... in the home." But Heller never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful."

Id. (internal citations omitted) (quoting Heller at 636, 626, 627 n.26).

**2. Seventh Circuit Court of Appeals precedent on the Second Amendment.**

The Seventh Circuit most recently addressed the sensitive places discussed in Bruen in Schoenthal v. Raoul, 150 F.4th 889 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026). In Schoenthal, the Seventh Circuit sought to determine the "unifying principle" among the four sensitive places specified in Heller and Bruen—schools, legislative assemblies, polling places, and courthouses—by "look[ing] at 'how' and 'why' the government historically burdened the right to carry weapons" in each place. Id. at 910. Reading Heller and Bruen "to say that schools are places where firearms can be prohibited for all individuals," the Seventh Circuit noted that "what

makes schools 'sensitive' must be something other than in loco parentis" authority over students. Id. at 909.

The Seventh Circuit found that schools, legislative assemblies, polling places, and courthouses "are all discrete places with unavoidable characteristics that potentially render it ill-advised to allow firearms":

> What happens within these places means that there is a pre-existing vulnerability or societal tension that would be exacerbated by the presence of firearms. And crucially, they are a list of dispersed places within a community, not the community itself, so regulation deprives the Second Amendment right only for a limited time.

Id. at 910.

In other words, "the sensitive places doctrine tells us that the appropriate balance" of armed self-defense and its risks, as settled by the Second Amendment, nonetheless "allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." Id. As relevant here, the Seventh Circuit found that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children." Id.

The government comparing modern laws "to regulations at those four sensitive places benefits from an already-completed historical analysis," and all the reviewing court "must do is make the analogy." Id. at 908. "When a modern law does not neatly compare to the regulations on the four prototypical sensitive places, as it often might not, the government should present additional historical evidence of analogous place-based restrictions to help locate the challenged law within our tradition." Id.

The Seventh Circuit then, if briefly, addressed day care firearms restrictions in this context:

> The government certainly should not try to convince us that a law's benefits outweigh the costs. It should show no more, and no less, than that the trade-off is one that accords with our history.
>
> Some place-based restrictions will look much like those in the past. (Think of a rule banning firearms at a daycare.) Other times, they will appear rather different.

Id. at 911 (emphasis added). The Seventh Circuit also noted, in response to the proposed analogy that children regularly take public transit:

> For many students, [the Chicago Transit Authority] serves as the functional equivalent of a school bus. To be sure, we are careful not to put too much weight on this similarity to schools. The Second Amendment does not vanish in the

> presence of children. But the fact that public transit serves the "vulnerable population[]" of children is a "why" that Section 65(a)(8) [the transit concealed carry ban at issue in Schoenthal] shares with historically permissible restrictions in schools.

Id. at 917 (citing Wolford v. Lopez, 116 F.4th 959, 1001 (9th Cir. 2024)).

As also relevant here, the Seventh Circuit established that "evidence stretching into the nineteenth century is useful to a Bruen inquiry," especially "when reviewing a state law, given that the states were not bound by the Second Amendment until the Fourteenth Amendment was ratified in 1868." Id. at 913.

**b. The Second Amendment's plain text covers the DCFS Rules.**

In Bruen, the Supreme Court held that, as to the first step of applying the Second Amendment, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. 1, 17 (2022).

Defendants argue that, while the Second Amendment protects the individual right to self-defense, "it does not speak to what an individual may or may not do when she voluntarily takes on the government's work as a foster care home operator or when

exploiting a state-conferred benefit such as the ability to operate a state-licensed commercial day care from her home." d/e 89, pp. 47-48.

The Second Amendment protects the "right of the people to keep and bear Arms," U.S. Const., amend. II—specifically, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. The DCFS Rules explicitly regulate based on place—private homes operating as day care homes and/or foster homes—and therefore predominantly impact those living in such homes. The regulations limit how and when firearms are to be maintained in the physical homes themselves: disassembled, unloaded, and locked in a safe free of ammunition for day care homes; and unloaded and locked in a safe free of any ammunition for foster homes. See 89 Ill. Admin. Code §§ 402.8(o); 406.8(a)(17)–(18) (the DCFS Rules).

While the DCFS Rules only regulate who may have firearms in such homes by virtue of who is in such homes, the Court has no reason to believe the Millers to be anything other than "law-abiding, responsible citizens," see Heller, 554 U.S. at 635, especially considering their attested compliance with the day care home and

foster home licensing requirements. See d/e 89, pp. 25-26, 28-30; d/e 96, pp. 4, 21-24; see also d/e 91 at DCFS000408–411, DCFS000195, DCFS002365–66.

Thus, the Court finds that "the Constitution presumptively protects th[e] conduct" regulated by the DCFS Rules of individuals seeking to maintain firearms in and in order to defend their homes. See Bruen, 597 U.S. at 24; see also Heller, 554 U.S. at 635. Defendants must, therefore, "justify [their] regulation[s] by demonstrating that [they are] consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24.

**c. The DCFS Rules are consistent with the Nation's historical tradition of firearm regulation in sensitive places.**

**1. Day care homes are sensitive places analogous to schools pursuant to Bruen and Schoenthal.**

As a threshold matter, the parties agree that licensed, regulated day care—with standards protecting children's safety—emerged only in the early- to mid-20th century. See d/e 89, p. 15; d/e 96, p. 18; see also d/e 89-6 (Decl. of C. Rymph and Expert Report of C. Rymph), pp. 34–39. Defendants do not argue that there is evidence before or "stretching into the nineteenth century"

constituting a history and tradition of regulating firearms in day cares, much less in day care homes. See Schoenthal v. Raoul, 150 F.4th 889, 913 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026); see also d/e 89, p. 15.

Plaintiffs argue that "common sense shows that one's home, with or without children in it, is nothing like public transportation, or a polling place, or a courthouse, nor – despite Defendants' arguments to the contrary – even a school." d/e 96, p. 46. Further, Plaintiffs argue that "if the home became a 'sensitive place,' the Second Amendment would be nullified." Id. The Court notes, however, that the question is not whether ordinary private homes are sensitive places, but whether licensed day care homes—the homes of individuals who sought and obtained that specific licensure—are sensitive places.

Defendants argue that licensed day care homes are analogous to schools. See d/e 89, p. 55. Defendants also provide several examples of witness testimony and historical laws in support of their argument that states have regulated firearms in places where children are present. Id. at 21-23; see also d/e 89-11 (Decl. of Patrick J. Charles ¶¶ 14-25 and accompanying footnotes).

This Court's prior Order (d/e 65) found that making "a determination as to whether day care homes are 'sensitive places' [would] inform the Court's" subsequent analysis under the means-end framework since overturned by Bruen. Id. at p. 29, see also Bruen, 597 U.S. at 19 ("Heller and McDonald do not support applying means-end scrutiny in the Second Amendment context."). Before assessing the DCFS Rules under means-end scrutiny, the Court found:

> The fact that day cares are designated spaces for the care of young children is a powerful indicator that they may be "sensitive places." Moreover, a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core "presumptively lawful" measures referenced in Heller. For these reasons, the Court finds that licensed day cares are "sensitive places" in which unusually restrictive firearms prohibitions may be permissible.

d/e 65, p. 31.

Bruen did not disturb any of the reasoning in Heller on which this Court relied in concluding that day cares are sensitive places. However, for the sake of thoroughness, this Court will now analyze whether day care homes are sensitive places pursuant to Bruen and Schoenthal.

When comparing modern laws "to regulations at those four sensitive places," including schools, the government "benefits from an already-completed historical analysis" and all the reviewing court "must do is make the analogy." Schoenthal, 150 F.4th at 908. Specifically, the Seventh Circuit found that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children." Id. Therefore, the Court accepts the already-completed historical analysis of schools as sensitive places and now assesses whether day care homes are, in fact, analogous to schools.

### A. The Millers' testimony and their compliance with the day care home licensure requirements establish that compliant day care homes, including their own, are learning environments.

The parties agree to the following facts about Plaintiff Jennifer Miller ("Miller") and her day care home. Miller cares for very young children during the day, as well as school-aged children, five years and up, after school. d/e 89, p. 31; d/e 96, p. 4; see also d/e 89-5 (Dep. of J. Miller) at 157:1-22, 158:10-20, 163:19-25. As a day care home operator, Miller provides help to school age children with homework, and during the COVID pandemic, she "ha[d] to do home

schooling." Id.; see also d/e 89-5 at 159:3–10, 163:19–25, 165:8–10. Miller uses her "teaching license" as part of running a day care home. Id.; see also d/e 89-5 at 159:6-13, 159:10–11. For younger children, Miller runs her day care "like a preschool program," featuring "a set schedule" with "circle time," "meal time," and "nap times." d/e 89, p. 32; d/e 96, p. 4; see also d/e 89-5 at 163:8–13. Miller has "had many preschool teachers tell [her] that [her] kids are well prepared for preschool." Id.; see also d/e 89-5 at 163:16–18.

The parties also agree that Miller has a day care home license and that she has completed and signed DCFS forms three times stating that she "will comply with all [license] requirements" after the day care home license is issued or renewed. d/e 89, pp. 28-30; d/e 96, pp. 4, 23; see also d/e 91 at DCFS000411, DCFS002115, and DCFS003878. Rule 406 contains DCFS' minimum licensing standards for day care homes, including the Day Care Home Rule regulating firearms. See 89 Ill. Admin. Code § 406; see also id. at § 406.8(a)(17)-(18).

For example, under Section 406.9, titled "Characteristics and Qualifications of the Day Care Family," day care home caregivers "shall exhibit competence in…[k]nowledge of the child's need to

explore and manipulate and the willingness to provide and maintain a home where children can enjoy living and learning." Id. at § 406.9(q)(5).

Section 406.15, titled "Guidance and Discipline," requires day care home licensees to teach children how to comport themselves through safe, age-appropriate behavior correction. See 89 Ill. Admin. Code § 406.15. Under Section 406.15(a), the day care home licensee "shall use disciplinary measures designed and carried out in such a way as to help individual children develop self-control and assume responsibility for their own acts." Id. at § 406.15(a). Section 406.15(a)(1) states that the day care home licensee "shall establish simple, understandable rules so that expectations and limitations are clear to the child." Id. at § 406.15(a)(1).

Similarly, Section 406.16, titled "Activity Requirements," requires day care home licensees to teach children basic subjects and skill building through participation. See 89 Ill. Admin. Code § 406.16. Under Section 406.16(b)(2), "[c]hildren shall be encouraged to participate in age appropriate household routines such as preparing food, setting tables, and cleaning up." Id. at § 406.16(b)(2). Other sections similarly direct day care home

licensees' caregivers to spur children's development around food and feeding: children under 30 months old "shall be allowed and encouraged to feed themselves when they indicate a readiness to do so," id. at § 406.22(d)(4), and "[c]hildren shall be encouraged but not forced to try new foods," id. at § 406.17(l)(2).

Section 406.16(b)(5) and (6) state that "[t]here shall be activities, both indoors and outdoors, in which children make use of both large and small muscles" as well as "a variety of chores and activities at the child's developmental level." Id. at § 406.16(b)(5)-(6). "Each child's individuality shall be respected and a sense of self and development of self esteem shall be encouraged." Id. at § 406.16(b)(7). Under Section 406.16(c)(1) and (3), "[s]imple play equipment, suitable to the age and developmental needs of the children, shall be available for use indoors and outdoors," and "[t]here shall be stimulating play and learning materials; these may include household items used creatively." Id. at § 406.16(c)(1), (3). Section 406.21 requires that, for school age children, "[a]ge appropriate materials shall be provided, including, but not limited to: puzzles, games, books, art supplies." Id. at § 406.21(b)(5).

The Court finds that day care homes are learning environments. Under Rule 406, day care home licensees and their supporting caregivers agree to demonstrate "willingness to provide and maintain a home where children can enjoy living and learning" and to encourage children's "sense of self and development of self esteem." Id. at §§ 406.9(q)(5), 406.16(b)(7). In other words, day care home licensees agree to cultivate a safe setting where children can "develop self-control and assume responsibility for their own acts;" understand "expectations and limitations" through "simple, understandable rules;" "participate in age appropriate household routines such as preparing food, setting tables, and cleaning up" and activities "mak[ing] use of both large and small muscles;" and use age- and developmentally-appropriate "play equipment" and "stimulating play and learning materials." Id. at §§ 406.15, 406.16. Miller has, admirably, exceeded these DCFS requirements using her background and experience in education by providing homework help for school-age children and implementing "a set schedule" "like a preschool program" with "circle time," "meal time," and "nap times" for younger children. See generally d/e 89-5.

The parties raise, and the Court is aware of, no reason why the historical prohibition on firearms in schools as sensitive places would be conditional on a specific curriculum taught or child age group served at a school. Thus, the Court finds that day care homes are learning environments, just as schools are. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

**B. Day care homes, by complying with the DCFS day care home licensure requirements, are overwhelmingly dominated by the presence of children, both physically and regulatorily.**

Under Section 406.13, titled "Numbers and Ages of Children Served," "[t]he maximum number of children under the age of 12 cared for in a day care home by a caregiver alone shall be 8," which "includes the caregiver's own children, related children and unrelated children under age 12 living in the home." Id. at § 406.13(a). A caregiver and an assistant may care for an additional four children who attend school full-time. Id. at § 406.13(c)-(d).

The Court finds that a personal home licensed to contain eight to twelve children supervised by two adults so as to operate as a day care home is overwhelmingly dominated by the physical presence of children.

The Court also notes that among DCFS' minimum licensing standards for day care homes in Rule 406 are several physical requirements for day care homes. See 89 Ill. Admin. Code § 406.8 ("General Requirements for Day Care Homes"). Day care home licensees must ensure that their homes have: a first aid kit, a fire extinguisher, protective coverings over electrical outlets, an operational smoke detector on every floor, a carbon monoxide detector within 15 feet of where children sleep if the home has an attached garage or uses fossil fuels, barriers around fixed heating sources in child-occupied areas, an operable telephone with emergency numbers posted, bathroom doors openable from the outside, closet doors openable from the inside, fencing or sidewalls and locked gates around any pools, and safe outdoor space for active play. See id.

Day care home licensees must ensure that their homes do not have: portable space heaters during the hours that child care is

provided; walls with lead paint, chipped or peeling paint, carpeting, fabric or plastic products; flammable or combustible art work exceeding 20% of any wall area; observable hazards; or fire hazards. See id.

Day care home licensees must maintain: written plans for ensuring children's safety when any wood-burning stoves or fireplaces are used during the hours that child care is provided; clean and well-ventilated indoor space; specific, seasonally-appropriate ambient temperatures; any hazardous materials stored in places inaccessible to children; written fire and tornado emergency plans and monthly drill logs; clear escape routes with operable lighting; daily escape route and monthly fire safety inspection logs; all blind, shade, and drape cords out of the reach of children; and radon tests every three years. See id.

The Court finds that these extensive physical restrictions on a day care home structure itself support the finding that day care homes are overwhelmingly dominated by the presence of children by way of necessitating safety requirements. Therefore, the Court finds that day care homes are overwhelmingly dominated by the presence of children, just as schools are. See Schoenthal v. Raoul,

150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

**C. The Day Care Home Rule is a temporary restriction on day care homes, which are scattered, discrete places.**

The Supreme Court in Bruen directed lower courts to consider "how and why regulations burden a law-abiding citizen's right to armed self-defense"—in other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—to identify historical analogues to modern firearm regulations. New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 29 (2022). Within that framework, "[t]he sensitive places doctrine tells us that the appropriate balance" of armed self-defense and its risks, as settled by the Second Amendment, nonetheless "allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." Schoenthal, 150 F.4th at 909.

This Court has addressed the "why" in finding that day care homes are learning environments overwhelmingly dominated by the presence of children and thus analogous to schools—"the risk is simply different, and reminiscent of risks addressed by regulations in our past" governing schools, see id., such that the burden on day care home licensees' "right of armed self-defense…is comparably justified." See Bruen, 597 U.S. at 29. The Court now considers the "how"—whether the Day Care Home Rule imposes "a comparable burden," id., on day care home licensees' right of armed self-defense as a "temporary restriction[] in scattered discrete places." Schoenthal, 150 F.4th at 909.

Plaintiffs argue that "[t]he spatial difference" between the "burden on the right of armed self-defense" posed by the sensitive place restrictions identified in Bruen and the DCFS Rules "can be described in terms of the Second Amendment's text: while the restrictions identified in Bruen limited 'the carrying of firearms in sensitive places,' id. (emphasis added), the [DCFS Rules] here bar law-abiding citizens from keeping them—in their own homes." d/e 94, p. 43 (emphasis in original).

But Plaintiffs' argument misses a crucial point: day care home licensees and foster home licensees, by seeking licensure, invite the state into their homes for the very purpose of regulating them. Regulation, by its very nature, may require change—not blanket permission. The licensure process that day care home licensees and foster home licensees seek requires state approval for relevant items to remain within—in a regulatory sense, to be carried back into—the licensee's private home in its capacity as a day care home or foster home. The constitutionality of such conditioning relative to government contracting or licensure, which this Court later addresses, does not change the fact that individuals choose to invite the state in to regulate their homes to license them as day care homes—with the same agency that those individuals may choose not to invite the state into their homes in pursuit of licensure or may choose to instead operate a day care outside of their homes.

As to whether the Day Care Home Rule is a "temporary restriction[]," see Schoenthal, 150 F.4th at 909, DCFS designated representative Meaghan Jorgensen testified that, if a day care home licensee had a handgun on the premises outside of operating hours, the licensee would not be in violation of the Day Care Home Rule.

See d/e 89, p. 11; d/e 96, p. 5. However, Plaintiffs claim that "the governing statute and Rules have no such limitation" and therefore are "a 24/7 restriction." d/e 98, p. 16. Further, Plaintiffs argue that while firearms restrictions in public places "only apply for as long as an individual is in one of those places—and the individual can avoid the disability by avoiding those places," the Day Care Home Rule "appl[ies] whenever the individual is home and cannot be avoided in this way." d/e 96, p. 46.

Even assuming that the Day Care Home Rule were to operate at all hours while the day care home licensee holds the license, the Court sees no reason why the Day Care Home Rule would apply either to day care home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the day care home license expires. The Court notes the Seventh Circuit's finding in Schoenthal that it "is entirely possible to avoid Section 65(a)(8) [the transit concealed carry ban at issue in Schoenthal], as Plaintiffs currently do. And, when an individual decides the benefit of using public transit outweighs the burden on his right to carry, the trade-off is temporary." Schoenthal, 150 F.4th at 915.

The Court finds such logic applicable here—when an individual day care home licensee decides that the benefit of operating a licensed day care out of his or her home outweighs the burden on his or her right to "use arms in defense of hearth and home," that trade-off is also temporary. See District of Columbia v. Heller, 554 U.S. 570, 635 (2008); see also Schoenthal, 150 F.4th at 915. In other words, day care home licensees can avoid the disability by avoiding self-imposed government regulation of their homes and not seeking day care home licensure. Therefore, the Court finds that the Day Care Home Rule is a temporary restriction on day care homes.

As to whether the day care homes regulated by the Day Care Home Rule are "scattered discrete places," see Schoenthal, 150 F.4th at 909, the Rule is among the minimum licensing standards for day care homes, see d/e 89, p. 10; d/e 96, p. 4, and thus only applies to the homes of day care home licensees. As this Court noted in its prior Opinion, and as remains unchanged by Bruen, relatively few people are affected by the Day Care Home Rule. See d/e 65, p. 33. The parties agree that none of the Organizational Plaintiffs have identified any members other than the Millers who

are day care home licensees. d/e 89, p. 34; d/e 96, p. 5. In other words, "[u]nlike the regulation struck down in Bruen," the Day Care Home Rule "does not broadly restrict arms uses by the public generally," but in the select homes of individuals who sought and obtained day care home licenses. See United States v. Rahimi, 602 U.S. 680, 698 (2024). Thus, the Court finds that day care homes regulated by the Day Care Home Rule are scattered, discrete places.

In determining whether the Day Care Home Rule imposes "a comparable burden" to historical regulations on schools, see Bruen, 597 U.S. at 29, this Court looks to the Seventh Circuit's reading of Heller and Bruen "to say that schools are places where firearms can be prohibited for all individuals." See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026). The Day Care Home Rule prohibits handguns "on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home" and requires any other firearm be "kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children." 89 Ill. Admin. Code

§§ 406.8(a)(17)–(18). The Court, having found day care homes analogous to schools, finds the Day Care Home Rule's prohibition—and, notably, employment and disassembly exceptions—constitutes "a comparable burden" to constitutional firearms regulations prohibiting firearms in schools. See Bruen, 597 U.S. at 29.

As to the Day Care Home Rule's "penalty—another relevant aspect of the burden," see United States v. Rahimi, 602 U.S. 680, 698 (2024), the parties agree that the maximum penalty for violating the Day Care Home Rule is revocation of the license to operate a day care home. d/e 89, p. 11; d/e 96, p. 4. According to Defendants' expert Patrick J. Charles, punishments for violating firearms prohibitions at schools, colleges, universities, and other institutions of higher learning included expulsion or other punishment imposed by the institution, fines, or forfeiture of the weapon. See d/e 89-11, p. 19 nn.37-38, p. 21 n.50, p. 22 n.54, p. 23 n.55, p. 24 nn.58-59, p. 27 n.67 (expulsion or school punishment); see also id. at pp. 8-9, p. 9 n.5, p. 19 n.40, p. 20 n.44, p. 24 n.61 (fines); see also id. at pp. 8-9, p. 9 n.5 (forfeiture of the weapon). The Court finds that the Day Care Home Rule, in, at most, revoking the license to operate a day care home, imposes a

comparable penalty to those historical regulations, if not a lesser penalty. See Rahimi, 602 U.S. at 698.

In sum, the Court finds that the Day Care Home Rule temporarily restricts day care homes as scattered, discrete places and imposes a comparable burden to constitutional firearms regulations prohibiting firearms in schools. The Court also finds that, by the Millers' own accounts and pursuant to the day care home regulations with which they comply, day care homes are learning environments overwhelmingly dominated by the presence of children, both physically and regulatorily, and are therefore analogous to schools. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children."); see also Schoenthal v. Raoul, No. 22-50326, 2024 WL 4007792, at *17 (N.D. Ill. Aug. 30, 2024), rev'd and remanded, 150 F.4th 889 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that analogizing "playgrounds and other adjoining school grounds" to schools to be "a seemingly straightforward analysis" and "[i]n a similar vein, childcare facilities have also been deemed

'sensitive.'"); Stickley v. City of Winchester, 110 Va. Cir. 300, 325 (Va. Cir. 2022) (analogizing recreation or community centers to schools); LaFave v. Cnty. of Fairfax, Virginia, No. 23-1605, 2024 WL 3928883, at *13-14 (E.D. Va. Aug. 23, 2024), aff'd in part, vacated in part, remanded, 149 F.4th 476 (4th Cir. 2025), cert. denied 146 S. Ct. 1799 (2026) (analogizing summer camps to schools); Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland, 680 F. Supp. 3d 567, 584 (D. Md. 2023) (analogizing childcare facilities to schools); Mintz v. Chiumento, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024) (analogizing day cares to schools).

Therefore, the Court finds that the Day Care Home Rule is "consistent with the Nation's historical tradition of firearm regulation" "in sensitive places such as schools[.]" New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 24, 30 (2022); see also Schoenthal, 150 F.4th at 911 (deeming "a rule banning firearms at a daycare" to be a "place-based restriction[] [that] look[s] much like those in the past" in explaining the government's burden to "show no more, and no less, than that the trade-off [between a law's benefits and costs] is one that accords with our history.").

**2. Foster homes are sensitive places analogous to schools pursuant to Bruen and Schoenthal.**

The parties agree that, while the modern foster care system descended from systems established during the 18th century colonial period—largely private practices centered on indigent children providing labor in exchange for support—as of the late 20th century, foster care has assumed a fundamentally different model focused on the child's welfare and safety and rejecting the idea that children must work for their care. See d/e 89, pp. 11-12; d/e 96, p. 18; see also d/e 89-6 (Decl. of C. Rymph and Expert Report of C. Rymph), pp. 5–25, 27, 37.

In the 18th century through the 1830s, indenture was the "preferred solution for the care of dependent children," in which contracts specified indigent children's service term and expected training—"the heart of the matter" was to turn children into self-sufficient workers. See d/e 89, p. 12; d/e 96, pp. 4, 16; see also d/e 89-6, pp. 5–10. The mid-19th century saw a rapid expansion of orphanages, in which older children (including poor children with living parents) were often bound out to provide labor; as well as "orphan train" programs, in which indigent urban children (many

with at least one living parent) were "plac[ed] out," or sent to live with and work for rural farm households. See d/e 89, pp. 12-13; d/e 96, p. 16; see also d/e 89-6, pp. 10-13.

"Boarding out," in which the government paid families small sums to board dependent children, became the third and preferred 19th-century precursor to modern foster care as child welfare reformers grew uncomfortable with the labor expected of placed-out children. See d/e 89, p. 13; d/e 96, pp. 16-17; see also d/e 89-6, pp. 14-15. This "led to greater state oversight," as "boarding out" "necessitated visits to the home, created opportunities to discuss the child's circumstances, and provided leverage for demands that a child be allowed to go to school or receive better support." See d/e 89, p. 13; d/e 96, p. 17; see also d/e 89-6, pp. 15-16.

State oversight of such programs accelerated in the 20th century. See d/e 89, p. 14; d/e 96, p. 16; see also d/e 89-6, pp. 17-18. With such oversight came increased professionalization and regulation, and a "significant goal of these standards was to ensure the health and safety of children placed in the custody of the state," including the "psychological well-being of foster children." See d/e 89, p. 14; d/e 96, pp. 17-18; see also d/e 89-6, pp. 22, 25-37. The

modern notion that "children of all economic classes should have a right to a sheltered childhood" marks "a considerable departure from the [18th] and [19th] century expectation that dependent children would work for their support." See d/e 89, p. 14; d/e 96, p. 18; see also d/e 89-6, pp. 34-37.

Defendants do not argue that there is evidence before or "stretching into the nineteenth century" constituting a history and tradition of regulating firearms in foster homes. Schoenthal v. Raoul, 150 F.4th 889, 913 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026); see also d/e 89, pp. 11-14.

The Court finds that most pre-19th century programs for housing children in need underwent such a "considerable departure" as to be comparably unrecognizable, and even antithetical, to modern foster care, given the radical transformation of the purpose behind such systems. See d/e 89, p. 14; d/e 96, p. 18; see also d/e 89-6, pp. 31-32. Turning children into self-sufficient workers through contracts for their service and possible demands, but no guarantee, that a child be allowed to go to school, is a wholly different purpose than ensuring the health, safety, and psychological well-being of children placed in the state's custody—

and ensuring that foster children are placed in "a foster family home...qualified to care for children," which Subsection 7(a) of the Illinois Child Care Act of 1969 requires that DCFS regulate. 225 ILCS 10/7(a)(17).

This Court's prior Order (d/e 65) found, in relevant part, that:

> Foster homes, like day cares and schools, are characterized by the presence of children. However, Defendants do not argue that foster homes are "sensitive places" like schools and day cares. Moreover, a foster home does not have defined hours in which children are present, but rather functions simultaneously as a home and a child care service at all times when a foster child is present. Accordingly, while the Court does not find that foster care homes are among Heller's "sensitive places," the Court will consider the unique and sensitive domestic nature of the foster home when the Court analyzes the Foster Home Rule under the two-step Ezell I framework.

Id. at pp. 38-39.

At the time of the prior Order including that dicta, Defendants did not argue that foster homes are "sensitive places" like schools and day cares, and the Court made its "sensitive places" determinations to inform, but not replace, the ultimately determinative means-ends analysis under step two of the Ezell I framework prescribed by the Seventh Circuit. See id. at pp. 29, 38. Critically, the Supreme Court had not yet issued Bruen establishing

the present two-step framework and the Seventh Circuit had not yet issued Schoenthal assessing the sensitive places, including schools, discussed in Bruen. For the sake of thoroughness and to ensure compliance with both Bruen and Schoenthal, this Court will now analyze whether foster homes are sensitive places.

Plaintiffs argue that "common sense shows that one's home, with or without children in it, is nothing like public transportation, or a polling place, or a courthouse, nor – despite Defendants' arguments to the contrary – even a school." d/e 96, p. 46. Further, Plaintiffs argue that "if the home became a 'sensitive place,' the Second Amendment would be nullified." Id. The Court notes, however, that the question is not whether ordinary homes are sensitive places, but whether licensed foster homes—the homes of individuals who sought and obtained that specific licensure—are sensitive places.

Defendants argue that the Foster Home Rule is consistent with this nation's history and tradition of restricting firearms in sensitive places such as schools and government buildings. d/e 89, p. 58. Defendants ask the Court to apply "nuanced judgments," as referenced in Bruen, in its analysis "[b]ecause modern foster homes

are profoundly different from anything that existed at the time of the founding" and "the analogy between foster homes and schools is strong." Id. at p. 59 (citing Bruen, 597 U.S. at 25).

When comparing modern laws "to regulations at those four sensitive places," including schools, the government "benefits from an already-completed historical analysis" and all the reviewing court "must do is make the analogy." Schoenthal, 150 F.4th at 908. Specifically, the Seventh Circuit found that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children." Id. Therefore, the Court accepts the already-completed historical analysis of schools as sensitive places and now assesses whether foster homes are, in fact, analogous to schools.

**A. The Millers' compliance with the foster home licensure requirements establishes that compliant foster homes, including their own, are learning environments.**

The parties agree that the Millers have a foster home license and that they have completed and signed DCFS forms three times stating that the information provided was true and two times acknowledging their compliance with Rule 402. d/e 89, pp. 25-26;

d/e 96, p. 22; see also d/e 91 at DCFS000002, DCFS002259, DCFS000033–36, DCFS002297-98, DCFS000193, DCFS002266, DCFS000195, DCFS002365–66. Rule 402 contains DCFS' minimum licensing standards for foster homes, including the Foster Home Rule regulating firearms. See 89 Ill. Admin. Code § 402; see also id. at § 402.8(o).

Section 402.20, titled "Education," requires foster parents to be directly involved in overseeing the formal education of the foster children in their care. See id. at § 402.20. "Foster parents shall encourage each child to complete high school or vocational training in accordance with his or her aptitude" and "shall cooperate with the supervising agency in the child's educational plan." Id. at § 402.20(a). Further, "[t]he supervising agency shall ensure that the foster parents shall maintain contact with those serving the educational needs of their children and seek their cooperation to assure that: 1) children are placed in appropriate grades and program; and 2) there is periodic evaluation of individual children." Id. at § 402.20(c).

Further, a "foster home license shall not be renewed until" a foster parent has completed DCFS-approved "educational advocacy

training," id. at § 402.12(m), which Rule 402 defines as "the 6-hour training that prepares foster parents to effectively advocate for the special educational needs of the children in their care by providing information on children's educational rights and foster parents' responsibility to protect those rights." Id. at § 402.2.

Rule 402 also requires foster home licensees to be involved in several non-academic aspects of the foster children's advancement. For example, Section 402(16), titled "Meeting Basic Needs of Children," requires foster home licensees to develop the foster child's personal and interpersonal skills and interests. See id. at § 402(16). Section 402.16(c) states that "[f]oster parents are expected to use" two concepts "for decision-making regarding the child's participation in extracurricular, cultural and social activities that are appropriate for the child's normal growth and development and enrichment." Id. at § 402.16(c).

One concept is the "reasonable and prudent parent standard," which Section 402.2 defines as the standard "that a caregiver shall use when determining whether to allow a child in out-of-home care to participate in extracurricular, enrichment, cultural, and social activities" and that is "characterized by careful and sensible

parental decisions that maintain the child's health, safety, and best interests while at the same time supporting the child's emotional and developmental growth." Id. at § 402.2 ("Definitions"; "Reasonable and prudent parent standard").

The other concept is "normalcy parenting," which Section 402.2 defines as "empowering a foster parent to approve or not approve a child's participation in appropriate extracurricular enrichment, cultural and social activities based on the caregiver's assessment using the reasonable and prudent parent standard, without prior approval of the Department, the caseworker or the court." Id. at § 402.2 ("Definitions"; "Normalcy parenting"). Section 402.2 continues, "[t]he goal of normalcy parenting and the reasonable and prudent parent standard is to allow the child's participation in extracurricular, enrichment, cultural and social activities that are appropriate for the child's normal growth and development." Id.

Under Section 402(16)(d), "[f]oster parents shall provide the child with enrichment and expanded learning opportunities to explore a wide variety of interest areas to expand his or her knowledge of learning possibilities that may lead to the child's

systematic and lifelong involvement in one or more interest areas." Id. at § 402(16)(d). Section 402(16)(e) states that "[f]oster parents shall help and support children in developing a relationship with their siblings, including siblings with whom the children do not yet have a relationship, and encourage and facilitate contact between the siblings." Id. at § 402(16)(e). Under Section 402(16)(j), "[e]ach child shall have the opportunity to learn to assume some responsibility for himself and for household duties in accordance with his age, health, and ability." Id. at § 402(16)(j).

Various provisions of Section 402 direct foster home licensees to permit and even urge foster children to try things: "[c]hildren shall be encouraged to eat the food that is served, but shall not be subjected to coercion or forced feeding[;]" "[e]ach child shall be given the opportunity to develop social relationships through participation in schools, and other community and group activities" and "to invite friends to the foster home and to visit in the home of friends[;]" "[c]hildren shall be permitted and encouraged to participate in appropriate indoor and outdoor recreation[;]" and "[c]hildren shall be permitted and encouraged to participate in extra-curricular activities including sports, art and music to the

extent of their interests, abilities, and talents." Id. at §§ 402.10(g), 402.16(f), 402.19, 402.20(b).

Similarly, Section 402.21, "Discipline of Children," requires foster home licensees to approach discipline in a safe and instructive manner. Id. at § 402.21. Section 402.2 defines "discipline" as "the process of helping children to develop inner controls so that they can manage their own behavior in socially acceptable ways." Id. at § 402.2. For example, under Section 402(21), "[d]iscipline shall be appropriate to the developmental age of the child" and "[t]he personal spending money of a child may be used as a constructive disciplinary measure to teach the child about responsibility and the consequences of his behavior." Id. at § 402.21(a), (i).

The Court finds that foster homes are learning environments. Under Rule 402, foster parents "shall" support the foster children's formal education by taking actions that inevitably occur, at least in part, in the licensed foster home: foster parents must "encourage" children in their care to complete high school or job training, help ensure those children receive "appropriate grades and program[ming]" and "periodic evaluation," and learn "to effectively

advocate for" those children's education rights that it is their "responsibility to protect." See §§ 402.20(a) and (c), 402.12(m), 402.2.

But Rule 402 also goes further and requires foster care licensees to help the foster children in their care learn to grow and to grow up—by providing the children "with expanded learning opportunities to explore a wide variety of interest areas to expand his or her knowledge of learning possibilities" and by making decisions on those children's "extracurricular, enrichment, cultural, and social activities" that "maintain the child's health, safety, and best interests while at the same time supporting the child's emotional and developmental growth" with the goal "to allow the child's participation[.]" See §§ 402.16(c)-(d), 402.2. Many of the developmental opportunities that foster care home licensees must provide directly involve the home: sibling relationships, play dates, household chores, food choices, spending money, discipline and behavioral management, and hobby preferences among indoor and outdoor recreation, sports, art, and music. See id. at §§ 402(16)(e), (f) and (j), 402.10(g), 402(21)(i), 402.19, 402.20(b).

The parties raise, and the Court is aware of, no reason why the historical prohibition on firearms in schools as sensitive places would be conditional on the subject matter taught or learned being exclusively academic. Thus, the Court finds that foster homes are learning environments, just as schools are. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

**B. Foster homes, by complying with the DCFS foster home licensure requirements, are overwhelmingly dominated by the presence of children, both physically and regulatorily.**

Under Section 402.15, titled "Number and Ages of Children Served," "[t]he maximum number of children permitted in a foster family home shall be six children less than 18 years of age who do not require specialized services except as permitted through Expanded Capacity waivers." 89 Ill. Admin. Code § 402.15(a)(2). The appendices on Extended Capacity foster homes state that, under specific circumstances including no foster child needing specialized care and all youth in care having the same mother or father, the

number of children allowed in a foster family home with an expanded capacity license is "[a]s needed in order to keep siblings together." Id. at § 402.Appendix B.

The Court finds that a personal home licensed to contain six to "as needed" foster children supervised by one to two foster parents so as to operate as a foster home is overwhelmingly dominated by the physical presence of children.

The Court also notes that among DCFS' minimum licensing standards for foster homes in Rule 402 are several physical requirements for foster homes. See 89 Ill. Admin. Code § 402.8 ("General Requirements for the Foster Home"). Foster home licensees must ensure that their homes have: a kitchen with properly operating standard appliances; a bathroom with properly operating standard fixtures; a water supply compliant with local and State health department requirements; a maximum hot water temperature of up to 115° Fahrenheit from all showers and bathtubs if the foster family home accepts children under age ten or who are developmentally disabled; specific fences or sidewalls and locked gates for any pools; an operating telephone; at least one approved operating smoke detector on every floor level and within

15 feet of every room used for sleeping; at least one operable fire extinguisher; two exits from any basements and attics used for sleeping; at least one approved carbon monoxide detector within 15 feet of every room used for sleeping (unless exempted by statute); adequate closet and dresser space to accommodate foster children's personal belongings; and rooms exposed to an outside window or with auxiliary means of ventilation. See id.

Foster home licensees must ensure that their homes do not have: "observable hazards," fire hazards, "any unsafe children's product as described in the Children's Product Safety Act [430 ILCS 125] and 89 Ill. Adm. Code 386 (Children's Product Safety)," an operational "commercial rooming or boarding house on the premises," smoking and vaping materials of any kind, any person smoking tobacco or other substances in—or within 15 feet of entrances, exits, openable windows, and ventilation intakes that serve—the foster family home, portable space heaters used in rooms where children sleep, or rodent and/or insect infestations. See id.

Foster home licensees must maintain: a first aid kit and supplies; life saving devices approved by the U.S. Coast Guard for any swimming pools; any alcoholic beverages and toxic/hazardous

materials where youth in care cannot access them; fire resistant partitions or barriers separating any portable and fixed space heaters in areas occupied by children; any dangerous household supplies and tools stored and disposed of in safe places inaccessible to children under 12 years of age; any prescription and nonprescription drugs in places not readily accessible to children under 12 years of age; rabies vaccine certificates for any pets and compliance with all State, tribal and local law and/or municipal code household pet requirements; a comprehensive list of emergency telephone numbers, including poison control, posted in a prominent place; and fire and emergency evacuation plans discussed and rehearsed quarterly with the foster children in the home. See id.

The Court finds that these extensive physical restrictions on a foster home structure itself support the finding that foster homes are overwhelmingly dominated by the presence of children by way of necessitating safety requirements. Therefore, the Court finds that foster homes are overwhelmingly dominated by the presence of children, just as schools are. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026).

(finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

### C. The Foster Home Rule is a temporary restriction on foster homes, which are scattered, discrete places.

The Supreme Court in Bruen directed lower courts to consider "how and why regulations burden a law-abiding citizen's right to armed self-defense"—in other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—to identify historical analogues to modern firearm regulations. New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 29 (2022). Within that framework, "[t]he sensitive places doctrine tells us that the appropriate balance" of armed self-defense and its risks, as settled by the Second Amendment, nonetheless "allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." Schoenthal, 150 F.4th at 909.

This Court has addressed the "why" in finding that foster homes are learning environments overwhelmingly dominated by the presence of children and thus analogous to schools—"the risk is simply different, and reminiscent of risks addressed by regulations in our past" governing schools, id., such that the burden on foster home licensees' "right of armed self-defense…is comparably justified." Bruen, 597 U.S. at 29. The Court now considers the "how"—whether the Foster Home Rule imposes "a comparable burden," id., as a "temporary restriction[] in scattered discrete places." Schoenthal, 150 F.4th at 909.

As to whether the Foster Home Rule is a "temporary restriction[]," see id., the Foster Home Rule is one of DCFS' minimum licensing standards for foster homes. See 89 Ill. Admin. Code § 402; see also id. at § 402.8(o). The Court sees no reason why the Foster Home Rule would apply to foster home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the foster home license expires, and neither party argues otherwise.

Plaintiffs argue that while firearms restrictions in public places "only apply for as long as an individual is in one of those places—

and the individual can avoid the disability by avoiding those places," the Foster Home Rule "appl[ies] whenever the individual is home and cannot be avoided in this way." d/e 96, p. 46.

This Court found in its prior order, as remains unchanged by Bruen, that "the Millers can, at any time, escape the application of the Foster Home Rule by giving up their foster caregivers' license." See d/e 65, pp. 42-43. The Court notes the Seventh Circuit's finding in Schoenthal that it "is entirely possible to avoid Section 65(a)(8) [the transit concealed carry ban at issue in Schoenthal], as Plaintiffs currently do. And, when an individual decides the benefit of using public transit outweighs the burden on his right to carry, the trade-off is temporary." Schoenthal, 150 F.4th at 915.

The Court finds such logic applicable here—when an individual foster home licensee decides that the benefit of operating a licensed foster home outweighs the burden on their right to "use arms in defense of hearth and home," that trade-off is also temporary. District of Columbia v. Heller, 554 U.S. 570, 635 (2008); see also Schoenthal, 150 F.4th at 915. In other words, foster home licensees can avoid the disability by avoiding self-imposed government regulation of their home and not seeking foster home

licensure. Therefore, the Court finds that the Foster Home Rule is a temporary restriction on foster homes.

As to whether the foster homes regulated by the Foster Home Rule are "scattered discrete places," see Schoenthal, 150 F.4th at 909, the Rule is among the minimum licensing standards for foster homes, see d/e 89, p. 8; d/e 96, p. 3, and thus only applies to the homes of foster home licensees. The parties agree that none of the Organizational Plaintiffs have identified any members other than the Millers who are foster home licensees. See d/e 89, p. 34; d/e 96, p. 5. In other words, "[u]nlike the regulation struck down in Bruen," the Foster Home Rule "does not broadly restrict arms uses by the public generally," but the select homes of individuals who sought and obtained foster home licenses. See United States v. Rahimi, 602 U.S. 680, 698 (2024). Thus, the Court finds that the foster homes regulated by the Foster Home Rule are scattered, discrete places.

In determining whether the Foster Home Rule imposes "a comparable burden" to historical regulations on schools, see Bruen, 597 U.S. at 29, this Court looks to the Seventh Circuit's reading of Heller and Bruen "to say that schools are places where firearms can

be prohibited for all individuals." See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026). The Foster Home Rule states, "[a]ny and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children." 89 Ill. Admin. Code § 402.8(o).

Like the Day Care Home Rule, the Foster Home Rule has an exception—that "[l]oaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures." Id., see also 89 Ill. Admin. Code § 406.8(a)(17)–(18). And unlike the Day Care Home Rule, the Foster Home rule does not require disassembly of the firearm, as this Court previously noted and remains unchanged by Bruen. See id., see also d/e 65, p. 40 ("However, the Foster Home Rule imposes a much less substantial burden on the Second Amendment rights of affected individuals than the Day Care Home Rule.").

The Court, having found foster homes analogous to schools, finds the Foster Home Rule's prohibition and accompanying employment exception constitutes "a comparable burden" to

constitutional firearms regulations prohibiting firearms in schools, if not a lesser burden. See Bruen, 597 U.S. at 29; see also D.C. v. Heller, 554 U.S. 570, 632 (2008) ("Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents."); see also Schoenthal v. Raoul, 150 F.4th 889, 915 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) ("Undoubtedly the Second Amendment does not bar a state legislature from finding ways to regulate firearms in a manner less restrictive than relevant historical traditions.").

As to the Foster Home Rule's "penalty—another relevant aspect of the burden," see United States v. Rahimi, 602 U.S. 680, 698 (2024), the parties agree that the maximum penalty for violating the Foster Home Rule is revocation of the foster caregiver license. d/e 89, p. 9; d/e 96, p. 5. According to Defendants' expert Patrick J. Charles, punishments for violating firearms prohibitions at schools, colleges, universities, and other institutions of higher learning included expulsion or other punishment imposed by the institution, fines, or forfeiture of the weapon. See d/e 89-11, p. 19 nn.37-38, p. 21 n.50, p. 22 n.54, p. 23 n.55, p. 24 nn.58-59, p. 27 n.67 (expulsion or school punishment); see also id. at pp. 8-9, p. 9

n.5, p. 19 n.40, p. 20 n.44, p. 24 n.61 (fines); see also id. at pp. 8-9, p. 9 n.5 (forfeiture of the weapon). The Court finds that the Foster Home Rule, in, at most, revoking the license to operate a foster home, imposes a comparable penalty to those historical regulations, if not a lesser penalty. See Rahimi, 602 U.S. at 698.

In sum, the Court finds that the Foster Home Rule temporarily restricts foster homes as scattered, discrete places and imposes a comparable burden to—if not a lesser burden than—constitutional firearms regulations prohibiting firearms in schools. The Court also finds that, pursuant to the foster home regulations with which the Millers comply, foster homes are learning environments overwhelmingly dominated by the presence of children, both physically and regulatorily, and are therefore analogous to schools. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children."); see also Schoenthal v. Raoul, No. 22-50326, 2024 WL 4007792, at *17 (N.D. Ill. Aug. 30, 2024), rev'd and remanded, 150 F.4th 889 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that analogizing

"playgrounds and other adjoining school grounds" to schools to be "a seemingly straightforward analysis" and "[i]n a similar vein, childcare facilities have also been deemed 'sensitive.'"); Stickley v. City of Winchester, 110 Va. Cir. 300, 325 (Va. Cir. 2022) (analogizing recreation or community centers to schools); LaFave v. Cnty. of Fairfax, Virginia, No. 23-1605, 2024 WL 3928883, at *13-14 (E.D. Va. Aug. 23, 2024), aff'd in part, vacated in part, remanded, 149 F.4th 476 (4th Cir. 2025), cert. denied 146 S. Ct. 1799 (2026) (analogizing summer camps to schools); Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland, 680 F. Supp. 3d 567, 584 (D. Md. 2023) (analogizing childcare facilities to schools); Mintz v. Chiumento, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024) (analogizing day cares to schools).

Therefore, the Court finds that the Foster Home Rule is "consistent with the Nation's historical tradition of firearm regulation" "in sensitive places such as schools[.]" New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 24, 30 (2022).

## IV. UNCONSTITUTIONAL CONDITIONS DOCTRINE ANALYSIS

Plaintiffs' challenge to the DCFS Rules pits the quintessential Second Amendment "right of an ordinary, law-abiding citizen to

possess a handgun in the home for self-defense," Bruen, 597 U.S. at 9, against the quintessential exception to that right that "arms carrying [can] be prohibited" "in sensitive places such as schools" and "in new and analogous sensitive places" "consistent with the Second Amendment," id. at 30 (emphasis in original). As this dynamic arises in the context of Plaintiffs' government licensee and government contractor relationships with the State of Illinois, the Court, having assessed the DCFS Rules pursuant to Bruen, now considers the interaction of Bruen and the unconstitutional conditions doctrine.

**a. Legal Precedent.**

**1. Supreme Court Precedent on the Unconstitutional Conditions Doctrine and Government Contractors.**

The unconstitutional conditions doctrine is "an overarching principle" "that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 604 (2013). The doctrine "aims to prevent the government from achieving indirectly what the Constitution prevents it from

achieving directly." Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health, 699 F.3d 962, 986 (7th Cir. 2012).

The Supreme Court has repeatedly "recognized that the Government has a much freer hand in dealing 'with citizen employees than it does when it brings its sovereign power to bear on citizens at large.'" Nat'l Aeronautics & Space Admin. v. Nelson, 562 U.S. 134, 148–49 (2011) ("NASA") (citing Engquist v. Oregon Dept. of Agric., 553 U.S. 591, 598 (2008); Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion)). The Justices have grounded this distinction "on the 'common-sense realization' that if every 'employment decision became a constitutional matter,' the Government could not function." NASA, 562 U.S. at 148–49 (citing Connick v. Myers, 461 U.S. 138, 143 (1983); Bishop v. Wood, 426 U.S. 341, 350 (1976)).

As this Court previously recognized, the Millers, as foster caregivers, are government contractors. See Dupuy v. Samuels, 397 F.3d 493, 514 (7th Cir. 2005) (agreeing that foster care is a "contractual role created by the State for the purpose of assisting the unfortunate victims of child abuse or neglect"); see also Fulton v. City of Philadelphia, Pennsylvania, 593 U.S. 522, 535-36 (2021)

(recognizing foster care agency as government contractor and holding licensing requirement for foster care agency unconstitutional under the Free Exercise Clause of the First Amendment); see also d/e 65, p. 41. "[T]he Government's broad authority in managing its affairs" does not "apply with diminished force" when dealing with "contract employees and not civil servants." NASA, 562 U.S. at 150.

In Engquist v. Oregon Department of Agriculture, the Supreme Court noted that "the government as employer indeed has far broader powers than does the government as sovereign," which stem "from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible." 553 U.S. 591, 598 (2008) (quoting Waters, 511 U.S. at 671 (plurality opinion)). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Engquist, 553 U.S. at 598–99 (quoting Waters, 511 U.S. at 675 (plurality opinion)).

The Justices reiterated that the Fourth Amendment does not require public employers to obtain warrants before searching an employee's office, see Engquist, 553 U.S. at 599 (citing O'Connor v. Ortega, 480 U.S. 709, 721–722 (1987) (plurality opinion)), that the Due Process Clause does not protect a public employee from even mistaken or unreasonable discharge, see Engquist, 553 U.S. at 599 (citing Bishop v. Wood, 426 U.S. 341, 350 (1976)), and that the First Amendment protects only public employee speech on matters of public concern and thus falling within the core of First Amendment protection, see Engquist, 553 U.S. at 600 (citing Connick v. Myers, 461 U.S. 138 (1983)). The Court affirmed two main principles of the public employee context:

> First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context. Second, in striking the appropriate balance, we consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer.

Engquist, 553 U.S. at 600.

In NASA v. Nelson, government contractor scientists working at a NASA facility alleged that the government's background check

violated a constitutional right to informational privacy. See NASA, 562 U.S. at 138-42. The contractors specifically challenged questions for the contractors about recent illegal drug use, treatment or counseling and "open-ended questions" for their references and landlords about their "honesty or trustworthiness," "violations of the law," "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," or "general behavior or conduct." Id. at 141-42.

The Supreme Court "assume[d], without deciding, that the Constitution protects a privacy right" related to "avoiding disclosure of personal matters." Id. at 138 (internal citations omitted). The Justices held that, whatever the scope of a "privacy interest of constitutional significance," "it does not prevent the Government from asking reasonable questions of the sort included on [the government contractors'] employment background investigation that is subject to the Privacy Act's safeguards against public disclosure." Id. at 147–48. Specifically, both challenged sets of questions "consist of reasonable, employment-related inquiries that further the Government's interests in managing its internal operations." Id. at 151.

The government had "good reason to ask employees [questions] about their recent illegal-drug use" because, "[l]ike any employer, the Government is entitled to have its projects staffed by reliable, law-abiding persons who will efficiently and effectively discharge their duties" and such questions "are a useful way of figuring out which persons have these characteristics." Id. at 152 (internal citations omitted). The Court cited in support an article indicating that "illicit drug use negatively correlated with work place productivity[.]" Id. (citing Breen & Matusitz, An Updated Examination of the Effects of Illegal Drug Use in the Workplace, 19 J. Human Behavior in the Social Environment 434 (2009)).

The Supreme Court also accepted the question about treatment or counseling for recent illegal drug use as "a reasonable, employment-related inquiry," as the government considering responses indicating treatment efforts "as a mitigating factor in determining whether to grant contract employees long-term access to federal facilities" constituted "a reasonable, and indeed a humane, approach." NASA, 562 U.S. at 152-53. The Justices flatly "reject[ed] the argument that the Government, when it requests job-related personal information in an employment background check,

has a constitutional burden to demonstrate that its questions are 'necessary' or the least restrictive means of furthering its interests," especially "where the Government acts, not as a regulator, but as the manager of its internal affairs." Id. at 153. The Court found the government's position that "phrasing the question in more permissive terms would result in a lower response rate, and the question's effectiveness in identifying illegal-drug users who are suitable for employment would be 'materially reduced'" to be reasonable and, citing Engquist, "falling within the 'wide latitude' granted the Government in its dealings with employees." Id. at 154.

Similarly, the Court found the open-ended questions for references and landlords to be "reasonably aimed at identifying capable employees who will faithfully conduct the Government's business" and "an appropriate tool for separating strong candidates from weak ones." Id. at 154. The questions' reasonableness, the Justices found, "is illustrated by their pervasiveness in the public and private sectors," and their use "furthers [the government's] interests in managing its operations." Id. at 154-55.

Absent precedent on when government contractors can be contractually required to relinquish their Second Amendment

rights, the Court also looks to relevant precedent in the more developed caselaw of freedom of speech under the First Amendment, to which the Supreme Court has "repeatedly compared the right to keep and bear arms." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 24, (2022) (citing D.C. v. Heller, 554 U.S. 570, 582, 595, 606, 618, 634–635 (2008)). The Supreme Court has established that government employees' statements made pursuant to their professional duties are categorically unprotected by the First Amendment. See Garcetti v. Ceballos, 547 U.S. 410, 426 (2006). Government contractors also "accept certain restrictions on their freedom as part of the deal." Fulton, 141 S. Ct. at 1878. Considerations of managerial efficiency require that governments be allowed considerable freedom in the management of their contractual relationships. See Comsys, Inc. v. Pacetti, 893 F.3d 468, 471 (7th Cir. 2018) (holding, in part because of the need to allow governments to flexibly manage their internal affairs, that the First Amendment does not protect public contractors from retaliation for job-related speech).

This Court also notes the Supreme Court's finding in Bruen that "[t]his Second Amendment [history and tradition] standard

accords with how we protect other constitutional rights," and that "our focus on history also comports with how we assess many other constitutional claims." New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 24-25 (2022). "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" Id. at 70 (quoting McDonald v. Chicago, 561 U.S. 742, 780 (2010) (plurality opinion)).

**2. Seventh Circuit Precedent on Illinois Foster Care.**

Foster care in Illinois is "a contractual role created by the State for the purpose of assisting the unfortunate victims of child abuse or neglect." Dupuy v. Samuels, 397 F.3d 493, 514 (7th Cir. 2005). Under the Due Process Clause of the Fourteenth Amendment, "a state has no constitutional duty to protect a child against parental abuse" except "where the danger to the child is "state-created," and "[o]nce a child is placed with a foster family prior to adoption, the state's duty continues through the period of foster care, as the state at that point is still legally the children's guardian." Lewis v. Anderson, 308 F.3d 768, 773–74 (7th Cir. 2002) (citing Terry B. v. Gilkey, 229 F.3d 680, 682 (8th Cir. 2000)). The

Seventh Circuit has also found that the State can violate foster children's constitutional rights by placing them "in a position of danger":

> [T]he state[,] [having] removed a child from the custody of her parents;...could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner, or the due process clause if he was awaiting trial.

K.H. Through Murphy v. Morgan, 914 F.2d 846, 849 (7th Cir. 1990) (internal citations omitted).

District courts in this circuit have found that licensed foster caregivers agree to partially relinquish their Fourth Amendment right to be free from unreasonable searches and seizures in exchange for licensure. See Van Dyke v. Fultz, No. 13-CV-5971, 2018 WL 1535141, at *4 (N.D. Ill. Mar. 29, 2018) ("Absent clearly established law to the contrary, a [DCFS contractor] social worker could reasonably have believed that Plaintiff had provided consent for a social worker to enter the home to retrieve [the foster child]

K.C., in exchange for Plaintiff being permitted to keep her grandchild K.C. in her home."); see also Courtney v. Murphy, No. 19-00174, 2021 WL 12310140, at *7 (S.D. Ind. Sept. 16, 2021) ("Because Daughter was a ward of the state and the Courtneys did not have a clearly established liberty interest in the foster arrangement with Daughter, it was not clearly established that the Fourth Amendment would prohibit the removal of Daughter.").

**3. Supreme Court and Seventh Circuit Precedent on the Unconstitutional Conditions Doctrine and Government Benefit Recipients.**

The unconstitutional conditions doctrine also "forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." Koontz, 570 U.S. at 606 (2013). The Supreme Court has included business licenses among such benefits. Id. at 608 (citing Frost v. R.R. Comm'n of State of Cal., 271 U.S. 583, 592-93 (1926)).

In Frost, the Supreme Court noted that the government "may not impose conditions which require the relinquishment of constitutional rights." Id. at 594. The Justices found that requiring private carriers to have a "certificate of public convenience and necessity" like common carriers to provide transportation for

compensation over public highways, or be prohibited from using public highways, violated the due process clause of the Fourteenth Amendment. Id. at 590, 599. The Court determined that the requirement "is in no real sense a regulation of the use of the public highways" but "a regulation of the business of those who are engaged in using them" intended "to protect the business of those who are common carriers in fact by controlling competitive conditions." Id. at 606.

The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) (citing Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59 (2006)) (internal citations omitted); see also Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin., 24 F.4th 640, 650 (7th Cir. 2022) (citing both).

"[T]he government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit

sought has little or no relationship to the property." Dolan v. City of Tigard, 512 U.S. 374, 385 (1994); see also Sheetz v. Cnty. of El Dorado, California, 601 U.S. 267, 275–76, (2024) (citing Dolan).

In Burgess v. Lowery, 201 F.3d 942 (7th Cir. 2000), the Seventh Circuit has found that:

> What the law of "unconstitutional conditions" boils down to, so far as it might be thought to help governments seeking to curtail the usual freedoms—in which application it ought to be called something like the doctrine of "constitutional conditioning"—is simply that conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right, such as the right to be free from unreasonable searches and seizures—provided the conditions are reasonable.

Id. at 947; see also United States v. Cranley, 350 F.3d 617, 620 (7th Cir. 2003).

On the specific benefit of government licenses, the Supreme Court in Federal Communications Commission v. National Citizens Committee for Broadcasting considered regulations prospectively barring formation or transfer of co-located newspaper-broadcast combinations and requiring ownership diversity for all new broadcast station licenses. 436 U.S. 775, 779, 786 (1978) ("F.C.C.").

When plaintiffs argued that the "regulations unconstitutionally

condition receipt of a broadcast license upon forfeiture of the right to publish a newspaper," the Court found that "[u]nder the regulations, however, a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community." Id. at 800.

**b. The DCFS Rules are reasonable restrictions on government contractors and licensees under the unconstitutional conditions doctrine.**

**1. Plaintiffs do not establish that the Second Amendment is exempt from restrictions on government contractors' and licensees' constitutional rights compliant with the unconstitutional conditions doctrine.**

Plaintiffs argue that the Supreme Court in Bruen did not announce a "government contractor exception" to its rule that a firearms restriction must be "consistent with this Nation's historical tradition of firearm regulation" to pass constitutional muster, and that Defendants do not show under that rule "that [the State] enjoys broad powers to limit the Second Amendment rights of government contractors." d/e 96, p. 51 (citing New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 17 (2022)) (internal citations omitted).

The Supreme Court found in Heller that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and in Bruen "that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." Bruen, 597 U.S. at 8–9 (citing D.C. v. Heller, 554 U.S. 570 (2008)) (emphasis added).

Justice Kavanaugh stated in his concurrence in Bruen that "all that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 76 (2022) (J. Kavanaugh, concurring). Justice Kavanaugh continued:

> Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in Heller [554 U.S. 570 (2008)] or McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns.

Bruen, 597 U.S. at 72 (J. Kavanaugh, concurring).

While the Court has no reason to doubt the Millers to be "law-abiding citizens" as referenced in Heller and Bruen, the Court has found that the Millers are not "ordinary." They are not only government contractors in their capacity as foster parents, but are among a limited subset of individuals who choose to invite DCFS in to regulate their homes for licensing as day care homes and foster homes in order to legally care for children whose safety DCFS is legally obligated to protect. See d/e 89, p. 10; d/e 96, p. 4.

The Court also notes that the Supreme Court in Bruen explained the consistency of rooting the Second Amendment framework in history and tradition by highlighting the consideration of history and tradition in determining compliance with the First Amendment:

> This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which Heller repeatedly compared the right to keep and bear arms. 554 U.S. at 582, 595, 606, 618, 634–635, 128 S.Ct. 2783. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); see also Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). In some cases, that burden includes showing whether the expressive conduct falls

> outside of the category of protected speech. See Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 620, n. 9, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003). And to carry that burden, the government must generally point to historical evidence about the reach of the First Amendment's protections. See, e.g., United States v. Stevens, 559 U.S. 460, 468–471, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

Bruen, 597 U.S. 1, 24–25 (2022).

All but one of the four First Amendment cases referenced in that passage pre-date Engquist—which neither party disputes to be good law, predated Bruen, and reiterated that the First Amendment protects only public employee speech on matters of public concern and thus falling within the core of First Amendment protection. Engquist v. Oregon Dept. of Agric., 553 U.S. 591, 600 (2008) (citing Connick v. Myers, 461 U.S. 138 (1983). Just as an assessment of history and tradition may not constitute the entire analysis of a First Amendment claim involving government employee speech, so, too, may a Second Amendment claim involving law-abiding but unordinary citizens—in this case, government contractors and licensees caring for children who the state has a statutory duty to

safeguard—require addressing analytical factors other than history and tradition.

At least one court analyzing the interplay between the Second Amendment post-Bruen and the unconditional conditions doctrine has relied on the Supreme Court's finding in Engquist. See Tyson-Phipps v. Blinken, No. 23-2316, 2024 WL 4128445 (S.D.N.Y. Sept. 10, 2024), report and recommendation adopted, No. 23-2316, 2024 WL 4444281 (S.D.N.Y. Oct. 8, 2024).

In Tyson-Phipps v. Blinken, a Special Agent with the United States Department of State's Bureau of Diplomatic Security received a reprimand after he was found carrying a personal firearm while on assignment and alleged a cause of action under the Second Amendment, alongside claims concerning other incidents under other controlling law. Id. at *3, *12. The presiding magistrate judge considered the Supreme Court's finding in Engquist that courts must balance government employees' constitutional rights "against the realities of the employment context" by "consider[ing] whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can

more readily give way to the requirements of the government as employer." Id. at *13 (quoting Engquist, 553 U.S. at 600 (2008)).

The magistrate judge, considering the plaintiff's Second Amendment claim independently from his other claims, found that this balancing principle in Engquist "counsels that the analysis contemplated in Heller and Bruen does not apply," a finding that the magistrate judge's district court did not disturb in accepting the magistrate judge's report and recommendation. See Tyson-Phipps, 2024 WL 4128445 at *13; see also Tyson-Phipps v. Blinken, No. 23-CV-2316, 2024 WL 4444281 at *2 (S.D.N.Y. Oct. 8, 2024). This Court agrees.

For all of these reasons, the Court finds that Bruen does not preclude the government from limiting government contractors' and licensees' Second Amendment rights subject to the unconstitutional conditions doctrine just as the government can limit government contractors' and licensees' other constitutional rights. See Bruen, 597 U.S. at 70 (finding that the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees."") (quoting McDonald v. Chicago, 561 U.S. 742, 780

(2010) (plurality opinion)); see also Tyson-Phipps, 2024 WL 4128445 at *13.

**2. The Day Care Home Rule does not violate the unconstitutional conditions doctrine.**

The parties agree that Jennifer Miller privately contracts with parents who pay for her licensed child care services, see d/e 89, p. 30; d/e 96, p. 4; such that she is a government licensee running a private business with her day care home license and is not a government contractor. The parties also agree that DCFS' obligation to protect children's safety extends to day care homes. d/e 89, p. 10; d/e 96, p. 4.

Defendants cite their Experts Dr. Matthew Miller and Dr. Deborah Azrael's report ("the Miller-Azrael Report") as relying on studies published in peer-reviewed public health and epidemiological literature and employing sound epidemiologic research designs and methods. See d/e 89, p. 15; see also d/e 89-7, 89-8. The Miller-Azrael Report states, in relevant part:

> [I]t is our opinion that the findings of the studies we cite apply equally to households in which children live and households in which children spend time…Fewer children attending in-home day care and/or housed in foster homes in Illinois will die or be injured by gunfire if the

> Foster Home Rule (Rule 402.8(o)) and the Day Care Home Rule (Rule 406.8(a)(17) and (18)) are in effect, compared to what would be the case if these regulations were not in place or relaxed.

d/e 89, pp. 15-16; see also d/e 89-7, pp. 2, 14, d/e 89-8, pp. 2, 14.

As and for the reasons the Court stated in its prior order, and unchanged by Bruen, the Court accepts the Miller-Azrael Report. Id.; see also d/e 65, pp. 35-37. Specifically, the Courts accepts the determinations that "the findings of the studies [Miller and Azrael] cite apply equally to households in which children live and households in which children spend time" and that "[f]ewer children attending in-home day care and/or housed in foster homes in Illinois will die or be injured by gunfire if [the DCFS Rules] are in effect, compared to what would be the case if these regulations were not in place or relaxed." See id.

**A. Plaintiffs do not establish that the Day Care Home Rule denies Jennifer Miller the benefit of a day care home license on a basis that infringes her Second Amendment rights.**

Plaintiffs cite the Supreme Court's finding in Rumsfeld that "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if

he has no entitlement to that benefit" and argue that it "has become clear in Second Amendment jurisprudence…that the right is entitled to no less protection than those of the First Amendment." d/e 98, p. 7 (quoting Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59 (2006)).

However, the Court finds that the Day Care Home Rule does not "deny a benefit to a person on a basis that infringes his constitutionally protected … [Second Amendment rights] even if he has no entitlement to that benefit." See Rumsfeld, 547 U.S. at 59; see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) (quoting Rumsfeld); see also Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin., 24 F.4th 640, 650 (7th Cir. 2022) (quoting Rumsfeld). Just as a newspaper owner subject to a requirement of ownership diversity for all new broadcast station licenses "need not forfeit anything in order to acquire a license for a station located in another community," see F.C.C. v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 800 (1978), a day care home licensee need not forfeit any Second Amendment right related to possessing a firearm in their home "in

order to acquire a license for a [day care] located in another" location that is not their home. See id.

Similarly, Plaintiffs cite the Supreme Court's finding in Frost v. Railroad Commission of State of California, 271 U.S. 583, 598 (1926), that "a state is without power to impose an unconstitutional requirement as a condition for granting a privilege." d/e 96, p. 57 (citing Frost). The Frost Court found unconstitutional a state requirement for private carriers to have a "certificate of public convenience and necessity" like common carriers to provide transportation for compensation over public highways or be prohibited from using public highways. Frost, 271 U.S. at 590, 599.

A parallel requirement in the day care home licensing context might require day care home licensees to comply with the Day Care Home Rule or be prohibited from exercising their Second Amendment rights. But the Day Care Home Rule does not so punish violators—the maximum penalty for violating the Day Care Home Rule is revocation of the license to operate a day care home, see d/e 89, p. 11; d/e 96, p. 4, not forfeiture of any violating firearm.

The Frost Court also found that the certificate requirement was "in no real sense a regulation of the use of the public highways" but "a regulation of the business of those who are engaged in using them" intended "to protect the business of those who are common carriers in fact by controlling competitive conditions." Frost, 271 U.S. at 591. Private carriers, the Supreme Court reasoned, faced a choice to "forego a privilege [of using the public highways] which may be vital to his livelihood or submit to a requirement"—of "dedicat[ing] his property to the quasi public use of public transportation" to get the certificate—"which may constitute an intolerable burden." Id. at 591, 593.

A parallel Second Amendment restriction would be "in no real sense a regulation of the use of [firearms protected by the Second Amendment]" but "a regulation of the business of those who are engaged in using them" intended "to protect the business of those who are [favored by the state] in fact by controlling competitive conditions." See id. at 591. Even assuming that, absent the Day Care Home Rule, Jennifer Miller would maintain in her home assembled, loaded firearms not locked in a safe free of ammunition as part of her business of running a day care home, perhaps to

provide protection, Plaintiffs offer no evidence that the Day Care Home Rule seeks "to protect the business of those who are [exercising their Second Amendment rights in a state-favored manner] in fact by controlling competitive conditions." See id. Although Plaintiffs deny that compelling compliance with Day Care Home Rule protects children's health and safety and assert the opposite, the parties agree that the Day Care Home Rule's purpose is to protect children's health and safety by preventing death, injury, and suicide by firearms. See d/e 89, p. 11, d/e 96, pp. 5-6.

Further, even assuming that maintaining assembled, loaded firearms that were not locked in a safe free of ammunition in a licensed day care home was protected by the Second Amendment, there is no indication that doing so would be "vital to [Jennifer Miller's] livelihood" or that submitting to the Day Care Home Rule "constitute[s] an intolerable burden" on her day care home business. Frost, 271 U.S. at 593. Miller attests that she has a day care home license and that she has completed and signed DCFS forms three times stating that she "will comply with all [license] requirements," which include the Day Care Home Rule, after the day care home license is issued or renewed. d/e 89, pp. 28-30; d/e

96, pp. 4, 23; see also d/e 91 at DCFS000411, DCFS002115, and DCFS003878; see also 89 Ill. Admin. Code § 406; see also id. at § 406.8(a)(17)-(18).

Therefore, the Court finds that Plaintiffs do not establish that the Day Care Home Rule denies or would deny Jennifer Miller the benefit of a day care home license on a basis that infringes her Second Amendment rights as established in Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59 (2006).

**B. The Day Care Home Rule, though sharing commonalities with constitutional conditions as determined by other government benefits tests, is best addressed under Burgess v. Lowery.**

Defendants propose several tests from different cases for determining what makes a government-imposed condition of employment reasonable. d/e 89, pp. 48-50. For the sake of judicial thoroughness, the Court considers each test, assuming that the Day Care Home Rule infringes on Jennifer Miller's Second Amendment rights through the government benefit of her day care home license.

First, Defendants reference the standard applied to government spending programs in Camelot Banquet Rooms, Inc. v.

United States Small Business Administration: to "tell the difference between an unconstitutional condition and a permissible congressional choice about whom to include in a government spending or subsidy program," 24 F.4th 640, 650 (7th Cir. 2022), the Supreme Court has indicated that the relevant distinction "is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." Id. (quoting Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214-15 (2013)); see also d/e 89, pp. 48-49. Plaintiffs argue that the considerations in Camelot are "irrelevant [because] [n]o one is asking the Defendants to fund the exercise of Second Amendment rights." d/e 98, pp. 6-7.

While the Day Care Home Rule does not involve government funding, both Camelot and the underlying Supreme Court case, Agency for International Development v. Alliance for Open Society International, Inc., concerned freedom of speech claims under the First Amendment, to which the Supreme Court has "repeatedly compared the right to keep and bear arms." New York State Rifle &

Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 24, (2022) (citing D.C. v. Heller, 554 U.S. 570, 582, 595, 606, 618, 634–635 (2008)). Further, several concepts underlying this test align with aspects of the Day Care Home Rule.

For example, even assuming that the Day Care Home Rule were to operate at all hours while the day care home licensee holds the license, the Court sees no reason why the Day Care Home Rule would apply either to day care home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the day care home license expires. Thus, the Day Care Home Rule "define[s] the limits," temporally, of the day care home program under DCFS' obligation to protect children's safety in day care homes and does not "seek to leverage funding to regulate [firearm use] outside the contours of the program itself" by operating after the day care home license expires. See Camelot, 24 F.4th at 650.

Further, the parties agree that DCFS is obligated to protect children's safety in day care homes. d/e 89, p. 10; d/e 96, p. 4. Defendants' Miller-Azrael Report states, and this Court accepts, that "[f]ewer children attending in-home day care…in Illinois will die

or be injured by gunfire if…the Day Care Home Rule (Rule 406.8(a)(17) and (18)) [is] in effect, compared to what would be the case if [the Day Care Home Rule was] not in place or relaxed." d/e 89, p. 16; see also d/e 89-7, 89-8. Thus, the Day Care Home Rule "specif[ies] the activities"—day care children's safety regarding firearms—that DCFS "wants to" license. See Camelot, 24 F.4th at 650.

Defendants also reference the "two-part test modeled on the unconstitutional conditions doctrine" outlined in Sheetz v. County of El Dorado, California: constitutional permitting conditions must have "an essential nexus to the government's land-use interest" and a "rough proportionality to the development's impact on the land-use interest," such that they may not "require[] a landowner to give up (or pay) more than is necessary to mitigate harms resulting from new development." 601 U.S. 267, 268 (2024) (internal citations omitted); see also d/e 89, p. 49. Plaintiffs argue that the necessity consideration in Sheetz was "specifically eliminated from Second Amendment analysis in Bruen." d/e 98, p. 6.

Regardless of the necessity consideration, this Court again sees similarities between this test and elements of the Day Care

Home Rule: the Rule, by regulating firearms, shares "an essential nexus" with Defendants' Miller-Azrael Report's finding that "[f]ewer children attending in-home day care…in Illinois will die or be injured by gunfire if…the Day Care Home Rule (Rule 406.8(a)(17) and (18)) [is] in effect," see d/e 89, p. 16, and a "rough proportionality" in lasting for the duration of the day care home license. See Sheetz, 601 U.S. at 268.

Lastly, Defendants reference the Seventh Circuit's finding in Burgess v. Lowery, 201 F.3d 942, 947 (7th Cir. 2000) that conditions "that may include the surrender of a constitutional right" "can lawfully be imposed on the receipt of a benefit…provided the conditions are reasonable." Id.; see also d/e 89, p. 48.

Plaintiffs argue that the purportedly "reasonable" conditions referenced in Burgess fail for several reasons: Burgess "did not clearly impose a 'rational basis' test in the unconstitutional conditions context;" the "suggest[ion] that any conditions must be 'reasonable' [is] best read as limited to the Fourth Amendment context specifically at issue in Burgess, where the underlying constitutional standard is itself 'reasonableness;'" and that any "'reasonableness' standard that existed before Bruen surely cannot

apply in the Second Amendment context now, given that decision's deliberate repudiation of this type of approach." d/e 96, p. 53.

The Court agrees that Burgess does not reference a rational basis test. However, the Seventh Circuit in Burgess, while directly addressing a Fourth Amendment claim, endorsed reasonableness as the standard used in the Supreme Court case Snepp v. United States addressing a First Amendment claim: "People who work for the CIA accept that they will have less freedom of speech than if they worked for McDonald's, but since the condition is a reasonable one the restriction on their freedom of speech is not considered unconstitutional." Burgess, 201 F.3d at 947 (citing Snepp v. United States, 444 U.S. 507 (1980) (per curiam)).

The Court also notes that the Supreme Court in Bruen clearly rejected the so-called "second step" in which courts considering Second Amendment claims would "apply 'strict scrutiny' and ask whether the Government can prove that the law is 'narrowly tailored to achieve a compelling governmental interest'" or, otherwise, "apply intermediate scrutiny and consider whether the Government can show that the regulation is 'substantially related to the achievement of an important governmental interest.'" New York State Rifle &

Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 18–19 (2022) (internal citations omitted). However, this Court does not read Bruen to categorically reject all reasonableness considerations in the Second Amendment context, with the Justices noting that:

> The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.

Id. at 59–60 (emphasis in original). Further, the Supreme Court found that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions," which did not include "requir[ing] law-abiding, responsible citizens to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public" like the New

York statute at issue in Bruen. Id. at 70 (citing D.C. v. Heller, 554 U.S. 570, 581 (2008)).

The Court finds that the test outlined in Burgess is the most applicable for assessing the Day Care Home Rule under the unconstitutional conditions doctrine, as it does not specify a specific medium, such as land use or government spending programs. Therefore, the Court applies the test in Burgess as the most appropriate fit for assessing the Day Care Home rule.

### C. The Day Care Home Rule is a Reasonable Condition Imposed on Receiving the Benefit of a Day Care Home License.

In Burgess, a government benefits case, the Seventh Circuit referenced Snepp, a government contractor case, and another Fourth Amendment government benefits case before the Seventh Circuit, Edmond v. Goldsmith. 183 F.3d 659 (7th Cir. 1999), aff'd sub nom. City of Indianapolis v. Edmond, 531 U.S. 32 (2000); see also Snepp v. United States, 444 U.S. 507 (1980); see also Burgess v. Lowery, 201 F.3d 942, 947 (7th Cir. 2000).

In Snepp, the Supreme Court considered a CIA agent who had signed a contract agreeing to seek agency review before publishing

any CIA-based material, but the agent published a book without submitting it for review. 444 U.S. 507, 507-508 (1980). The Justices noted the CIA's need to "guarantee the security of information that might compromise [foreign sources] and even endanger the personal safety of foreign agents." Id. at 512. The Supreme Court cited substantial precedent allowing the government "to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment," and deemed the pre-publication review requirement reasonable:

> The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service. The agreement that Snepp signed is a reasonable means for protecting this vital interest.

Id. at 510, n.3 (internal citations omitted).

The Seventh Circuit in Burgess also cited Edmond for the proposition that metal detector requirements for air travel passengers are reasonable because they are unintrusive and protective:

> Clearly it is reasonable, regardless of the doctrinal rubric, for the government to require airline passengers to step

> through a metal detector even though there is no reasonable suspicion that a given passenger is carrying a weapon. In part because the search is not intrusive, and in part because of the danger that an armed passenger poses on an airplane in flight, this condition on the right to travel by air is reasonable.

Burgess v. Lowery, 201 F.3d 942, 947 (7th Cir. 2000) (citing Edmond v. Goldsmith, 183 F.3d 659, 664 (7th Cir.1999).

The Seventh Circuit elaborated on this point further in Edmond itself, which addressed the City of Indianapolis erecting roadblocks to catch drug offenders. Edmond, 183 F.3d at 661. Behind the "administrative searches conducted without any basis to suspect any particular individual of wrongdoing, but rather pursuant to a program of inspections incidental to a general scheme of licensing or other regulation" that the Supreme Court had upheld, the Seventh Circuit identified "concern…with securing safety or efficiency of the activity in which the people who are searched are engaged." Id. at 663-64. The Seventh Circuit cited as examples:

> The [transport worker] employee who uses drugs will perform badly in his work, to the detriment of fellow employees or the general public; and the most effective preventive measure may be to test all or a random selection of applicants or employees. Similar are sobriety checkpoints, which are designed to protect other users of

> the road from the dangers posed by drunk drivers; administrative searches that are ancillary to concededly lawful systems of inspection; and the use of metal detectors and x-ray machines to screen entrants to government buildings and embarking air travelers. These cases rest on the commonsense principle that employers and other proprietors (such as the state as the owner of public roads), including the quasi-proprietor that is the government in heavily regulated industries, see, e.g., United States v. Biswell, 406 U.S. 311, 316–17, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), have a right to take reasonable measures to protect the safety and efficiency of their operations. These measures, moreover, usually make only limited inroads into privacy, because a person can avoid being searched or seized by avoiding the regulated activity, though we hesitate to put much weight on this point; people are unlikely to feel they can afford to "ground" themselves in order to avoid airport searches.

Edmond, 183 F.3d at 664 (emphasis added) (out-of-circuit internal citations omitted) (citing the "pervasively regulated business" of firearms dealing in Biswell, see 406 U.S. at 316.). The Court noted that Indianapolis in seeking the roadblocks "does not claim to be concerned with protecting highway safety against drivers high on drugs" and ultimately found that the restriction did not satisfy the regulatory search exception to the principle requiring a basis to believe a search "will yield evidence or fruits or instrumentalities of crime." Edmond, 183 F.3d at 664-66.

To summarize, Snepp involved a government contractor bringing suit under the First Amendment, Burgess involved a Fourth Amendment challenge concerning the government benefit of prison visit free from strip searches, and Edmond involved a Fourth Amendment challenge against city-sponsored roadblocks to catch drug offenders. Nonetheless, this Court notes a common thread among all three cases: courts have found that the government, as both contractual employer and as quasi-proprietor in heavily regulated industries, may impose restrictions on employees or industry participants that are reasonable, in that they are partial restrictions on the involved individuals' constitutional rights to protect the public's physical safety.

CIA agents access classified information that can jeopardize the physical safety of both foreign agents abroad and citizens at home, so the Supreme Court found a pre-publication review, as opposed to a full publication ban, to be reasonable. See Snepp, 444 U.S. at 510, n.3; see also Burgess, 201 F.3d at 947. Armed airplane passengers are uniquely dangerous to their fellow passengers in a miles-high capsule, so the Seventh Circuit found a warrantless metal detector requirement, as opposed to a more invasive search,

to be reasonable. See id.; see also Edmond, 183 F.3d at 664. Conversely, requiring prison visitor strip searches "without regard to the inmate's crime or punishment," when the prisoners were strip searched beforehand and guards continuously surveilled the visits, was "manifestly unreasonable." Burgess, 201 F.3d at 947.

Turning to the facts at bar, day care homes are extensively regulated, namely by Rule 406's minimum licensing standards for day care homes. See 89 Ill. Admin. Code § 406. While not at the level of DCFS' legal custody and guardianship of foster children, DCFS is nonetheless obligated to protect children's safety in day care homes. See d/e 89, pp. 7, 10; d/e 96, pp. 3-4. As such, the government operates as "quasi-proprietor…in [the] heavily regulated industr[y]" of licensing day care homes. See Edmond, 183 F.3d at 664.

Even assuming that the Day Care Home Rule were to operate at all hours while the day care home licensee holds the license, the Court sees no reason why the Day Care Home Rule would apply either to day care home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the day care home license

expires. As such, the Day Care Home Rule imposes a more moderate restriction on Jennifer Miller's firearms. Day care home licensees also "can avoid being [subject to the Day Care Home Rule] by avoiding the regulated activity" of running a day care home out of their home—though the Court declines "to put much weight on this point," in case existing day care home licensees are "unlikely to feel they can afford to [not run a home day care] in order to avoid" the Rule. Id., see also F.C.C. v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 800 (1978) (when plaintiffs argued that the "regulations unconstitutionally condition receipt of a broadcast license upon forfeiture of the right to publish a newspaper," finding that "[u]nder the regulations, however, a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community.").

However, the Day Care Home Rule clearly serves to protect the public's physical safety—specifically, the safety of children cared for in licensed day care homes. Defendants' Miller-Azrael Report states, and this Court accepts, that "[f]ewer children attending in-home day care…in Illinois will die or be injured by gunfire if…the Day Care Home Rule (Rule 406.8(a)(17) and (18)) [is] in effect, compared to

what would be the case if [the Day Care Home Rule were] not in place or relaxed." d/e 89, p. 16; see also d/e 89-7, 89-8. Although Plaintiffs deny that compelling compliance with Day Care Home Rule protects children's health and safety and assert the opposite, the parties agree that the Day Care Home Rule's purpose is to protect children's health and safety by preventing death, injury, and suicide by firearms. See d/e 89, p. 11, d/e 96, pp. 5-6. Therefore, the Day Care Home Rule is a government measure "to protect the safety and efficiency of their operations" of licensing day care homes. See Edmond, 183 F.3d at 664.

The Court finds that the Day Care Home Rule, assumed to infringe on Jennifer Miller's Second Amendment rights, is a reasonable government restriction on her day care home license because the Rule is a partial restriction on those rights in order to protect the physical safety of the children in her day care home who DCFS is obligated to protect. See Burgess, 201 F.3d at 947; see also Edmond, 183 F.3d at 664; see also Snepp, 444 U.S. at 510-12; see also d/e 89, p. 10; d/e 96, p. 4.

As the Court found previously, Plaintiffs do not establish that the Day Care Home Rule denies Jennifer Miller a government

benefit on a basis that infringes her Second Amendment rights. Therefore, the Court does not find that the Day Care Home Rule "burdens[] the Constitution's enumerated rights by coercively withholding benefits from those who exercise them" so as to violate the unconstitutional conditions doctrine. Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. at 606 (2013).

**3. The Foster Home Rule does not violate the unconstitutional conditions doctrine.**

The Court now follows the Supreme Court's directive in Engquist to balance government contractors the Millers' constitutional rights "against the realities of the employment context" by "consider[ing] whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer." Engquist v. Oregon Dept. of Agric., 553 U.S. 591, 600 (2008).

The Foster Home Rule requires that firearms be unloaded and locked in a safe free of any ammunition for foster homes. See 89 Ill. Admin. Code § 402.8(o). Unlike the Day Care Home Rule, the Foster Home Rule does not require disassembly of the foster home

licensee's firearms. See id., see also d/e 65, p. 40 ("the Foster Home Rule imposes a much less substantial burden on the Second Amendment rights of affected individuals than the Day Care Home Rule.").

The Supreme Court in Heller cautioned that its analysis should not be taken to "suggest the invalidity of laws regulating the storage of firearms to prevent accidents" under the Second Amendment, D.C. v. Heller, 554 U.S. 570, 632 (2008), and the parties agree that DCFS created the Foster Home Rule to increase the health and safety of foster children by protecting them from injury and death from firearms, including by suicide. d/e 89, p. 9; d/e 96, p. 15. Thus, the Court finds that the asserted employee right does not "implicate the basic concerns of the relevant constitutional provision." Engquist, 553 U.S. 591, 600 (2008).

As the Court has noted, after the Millers choose to no longer maintain their foster home license or it expires, the Millers may have loaded firearms that are not locked in a safe free of any ammunition. Further, DCFS is "charged by law with doing particular tasks," see Engquist, 553 U.S. at 598—specifically, acting in the best interests of the foster children of whom it has legal

custody and guardianship. d/e 89, p. 7; d/e 96, p. 3. DCFS contracts with foster home licensees "to help do those tasks as effectively and efficiently as possible." See Engquist, 553 U.S. 591, 598 (2008) (quoting Waters, 511 U.S. at 671 (plurality opinion)).

"The government's interest in achieving its goals as effectively and efficiently as possible is elevated…to a significant one when it acts as employer." See Engquist, 553 U.S. at 598–99 (quoting Waters, 511 U.S. at 675 (plurality opinion)). Additionally, Illinois—like any other parent or legal guardian—must be afforded considerable latitude to make its own reasonable decisions regarding how best to ensure the physical safety of the children in its custody. Therefore, the Court finds that "the claimed right can more readily give way to the requirements of the government as employer." See Engquist, 553 U.S. 591, 600 (2008).

The Court also considers the reasonableness determinations made by the Supreme Court in NASA, which found that questions about government contractors' potential drug use and overall integrity "consist[ed] of reasonable, employment-related inquiries that further the Government's interests in managing its internal operations." NASA v. Nelson, 562 U.S. 134, 151 (2011). The

Justices, in determining the challenged drug questions' reasonableness, cited as relevant considerations: the government's "entitle[ment] to have its projects staffed by reliable, law-abiding persons who will efficiently and effectively discharge their duties," the questions' "useful[ness] [in] figuring out which persons have these characteristics," a scholarly article indicating that "[the questions' subject matter] negatively correlated with work place productivity," and that "phrasing the question in more permissive terms would result in a lower response rate" and "materially reduce[]" "the question's effectiveness in identifying illegal-drug users who are suitable for employment." Id. at 152, 154.

The Supreme Court, in determining the challenged integrity-related questions' reasonableness, similarly cited as relevant considerations: that the questions were "reasonably aimed at identifying capable employees who will faithfully conduct the Government's business" and "an appropriate tool for separating strong candidates from weak ones," the questions' "pervasiveness in the public and private sectors," and that their use "further[ed] [the government's] interests in managing its operations." Id. at 154-55.

The Court finds that the Foster Home Rule satisfies these reasonableness metrics. DCFS is required by law to act in the child's best interests, see d/e 89, p. 7; d/e 96, p. 3, and Defendants cite the Miller-Azrael Report for the proposition that "[f]ewer children …housed in foster homes in Illinois will die or be injured by gunfire if [the Foster Home Rule is] in effect, compared to what would be the case if [the Rule were] not in place or relaxed." See d/e 89, pp. 15-16; see also d/e 89-7, 89-8.

Thus, the Foster Home Rule is "useful" in keeping children safe around firearms—Defendants' expert report demonstrates that the Rule is positively correlated with keeping foster children safe around firearms and that implementing it "in more permissive terms would result in a lower" benefit and "materially reduce[]" its "effectiveness in" keeping children safe around firearms, as part of serving as a government contractor foster care parent. See NASA, 562 U.S. at 154.

In addition to the rule being "aimed at" "further[ing] [the government's] interests in managing its operations," the "pervasiveness in the public and private sectors" of a gun restriction like the Day Care Home Rule also cuts in favor of its

reasonableness. See id. In Tyson-Phipps v. Blinken, the magistrate judge found that the balancing principle in Engquist "counsels that the analysis contemplated in Heller and Bruen does not apply. Instead, it is enough to say that just as a private employer engaged in security would obviously be justified in barring its employees from carrying their personal handguns on the job, so too may the Government here." See Tyson-Phipps v. Blinken, No. 23-2316, 2024 WL 4128445 (S.D.N.Y. Sept. 10, 2024). The Court agrees that a private employer—whether engaged in security, child care, or both, as foster home parents may well be categorized—would be "justified in barring its employees from carrying their personal handguns on the job" or from keeping firearms and ammunition where they are on the job that are not "stored and locked up separately at all times and kept in places inaccessible to children." See 89 Ill. Admin. Code § 402.8(o).

In sum, the Foster Home Rule properly balances government contractors the Millers' constitutional rights "against the realities of the employment context" as a reasonable measure compliant with the unconstitutional conditions doctrine. See Engquist v. Oregon

Dept. of Agric., 553 U.S. 591, 600 (2008); see also NASA v. Nelson, 562 U.S. 134, 151 (2011).

## V. CONCLUSION

The Court finds that the plain text of the Second Amendment covers the Day Care Home Rule and the Foster Home Rule, that day care homes and foster homes are sensitive places analogous to schools where firearms may be restricted, and, therefore, that the Day Care Home Rule and the Foster Home Rule restricting firearms kept in day care homes and foster homes, respectively, are constitutional. The Court also finds that both the Day Care Home Rule and the Foster Home Rule are reasonable restrictions on government contractors' and licensees' assumedly implicated Second Amendment rights.

For the reasons set forth, Defendants' Motion for Summary Judgment (d/e 89) is GRANTED and Plaintiffs' Motion for Summary Judgment (d/e 94) is DENIED. The Clerk is DIRECTED to enter final judgment in favor of Defendants Heidi Mueller and Kwame Raoul and against the Plaintiffs. Any pending motions are DENIED as MOOT, any pending deadlines are TERMINATED, and any scheduled settings are VACATED. This case is CLOSED.

**ENTERED: August 3, 2026.**
**FOR THE COURT:**

**/s/ Sue E. Myerscough**
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**

E-FILED
Tuesday, 11 August, 2026 12:02:11 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY,

Plaintiffs,

v.

Case No. 3:18-CV-3085

HEIDI MUELLER, in her official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois,

Defendants.

**NOTICE OF APPEAL**

Plaintiffs, JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, do hereby appeal to the United States Court of Appeals for the Seventh Circuit from the judgment of this Court entered on August 3, 2026, that granted Defendants' Motion for Summary Judgment (Dkt. #105)[1], and the decision stating same, entered on August 3, 2026 (Dkt. #104).

By: /s/ David G. Sigale
David G. Sigale
Attorney for Plaintiffs

1 The text of the Judgment Order (Dkt. #105) states that the Plaintiffs' action against the Defendants "is dismissed," but the pleadings and Court's Opinion (Dkt. #104) make clear that the matter was before the Court on cross-motions for summary judgment.

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

**CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING**

The undersigned certifies that:

1. On August 11, 2026, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

2. Pursuant to F.R. Civ. P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

/s/ David G. Sigale
Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com